**Doyle J. WILLIAMS, Appellant,**

v.

**Bill ARMONTROUT, Warden, Appellee.**

No. 88–1027.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 16, 1988.

Decided June 20, 1989.

Rehearing and Rehearing En Banc
Denied Aug. 7, 1989.

Charles W. German, Kansas City, Mo., for appellant.

Stephen D. Hawke, Jefferson City, Mo., for appellee.

Before ARNOLD, Circuit Judge, BRIGHT, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Doyle Williams appeals the dismissal of his petition for writ of habeas corpus under 28 U.S.C. § 2254. In these proceedings, he challenges his Missouri conviction for capital murder, resulting in a sentence of life in prison without possibility of parole for fifty years. Williams raises several issues in his appeal, including the admissibility of eyewitness identification testimony, the effec-

tiveness of his trial counsel and allegations of misconduct by the State. We affirm.

## I. BACKGROUND

On October 11, 1980, police recovered the body of Dr. A.H. Domann, who was last seen alive on October 6, 1980, from a clay pit north of Auxvasse, Missouri. Police found three .45 caliber bullets in Domann's body. In March of 1981, the State charged Williams with Domann's murder. A jury trial began the following October.

John Morgan testified that on October 7, 1980, Williams took him to the clay pit north of Auxvasse and told Morgan that he, Williams, had murdered Domann the day before. Morgan testified that Williams described the murder and following events in great detail. Morgan also testified that he and Williams had discussed killing Domann on several occasions in order to prevent Domann from testifying on a forgery charge against Williams.

Barbara Rea testified that Williams attended a party at her trailer home late in the day on October 5, 1980, at which Williams and other party guests fired weapons at a trash dump outside the trailer. Several party guests testified at trial. This testimony revealed that Williams brought to the party a briefcase containing several guns. At least one of those guns was a .45 caliber automatic pistol which party guest Randy Clardy fired, as did Doyle Williams. Betty Coleman, Williams' girlfriend, also possessed a .45 caliber automatic weapon which she fired at the party. Later, law enforcement officers recovered ten .45 caliber bullets and eight .45 caliber cartridge casings near the trash dump. Expert testimony at trial established that five of the expended bullets found at the dump were from the same gun that killed Domann. Further expert testimony excluded Betty Coleman's .45 caliber weapon as the gun used to kill the doctor. Police never recovered the murder weapon.

Jessie Purvis, a neighbor of Dr. Domann, testified that at approximately 5:45 a.m. on October 6, 1980, she saw Williams' white car in front of her house, just catercorner from Domann's house, on three separate occasions. Later that day, police officer Oscar Ross drove Purvis through Auxvasse, at which time she identified Doyle Williams' car as the car she had seen that morning. Purvis testified that she did not see a license plate on the front of the car. Officer Ross testified that Williams' car had only a rear license plate, none on the front.

Dedra Herdeg testified that on October 5, 1980, between 10:00 and 10:30 in the morning, while she worked as a clerk at a gas station convenience store, a man asked her for directions to Domann's house. At trial, Herdeg identified Williams as the person who sought directions from her. Williams claims that the admission of Herdeg's testimony violated due process because it was tainted by suggestive pretrial photo lineups and a suggestive hypnosis session.

Following trial, the jury convicted Williams of Domann's murder and sentenced him to life in prison without possibility of parole for fifty years. The Missouri Court of Appeals affirmed the conviction, *State v. Williams*, 662 S.W.2d 277 (Mo.Ct. App.1983), and subsequently denied him post-conviction relief, *Williams v. State*, 730 S.W.2d 284 (Mo.Ct.App.1987).

Williams then filed this petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Eastern District of Missouri. The district court denied the petition. This appeal followed.

## II. DISCUSSION

### A. *Dedra Herdeg's In–Court Identification*

Williams argues that Dedra Herdeg's in-court identification of him as the man who asked her for directions to Domann's house should be rejected as so unreliable as to violate his constitutional right to due process.

#### 1. Procedural Bar

■ The State claims that Williams is procedurally barred from challenging Herdeg's in-court identification because

Williams failed to contemporaneously object to the identification. However, on Williams' direct appeal from his conviction, the Missouri Court of Appeals exercised its discretionary power to determine whether plain error occurred and found that neither the hypnosis nor the lineup affected Herdeg's identification. *State v. Williams,* 662 S.W.2d at 281. Thus, the state court adequately undertook discretionary review of these claims and no procedural defect exists to bar federal review. *See Engle v. Isaac,* 456 U.S. 107, 135 n. 44, 102 S.Ct. 1558, 1575 n. 44, 71 L.Ed.2d 783 (1982).

### 2. The In–Court Identification

■ Williams calls Herdeg's in-court identification so unreliable as to violate due process. Police first interviewed Herdeg on October 13, 1980, after learning that she had given someone directions to Domann's house on October 5, the day before the murder. At that time, police showed her seven photographs, five of men and two of women. Herdeg identified Williams as the man who asked directions to Domann's home. Only Williams' photograph, however, showed a man with glasses and a beard. Police displayed this same photospread to Herdeg on two separate occasions.

Sometime later, ostensibly in an attempt to help Herdeg remember and describe the automobile of the man who asked for directions, Herdeg permitted a police officer to hypnotize her. At the hypnosis session, a police officer showed her a photograph of Williams. Police displayed no other photographs to Herdeg, nor kept any sort of recording of the hypnosis session. The trial court granted Williams' motion to suppress the photographic lineup, but denied the motion to suppress any identification at trial.

Williams charges that the lineups and the hypnosis session violated his constitutional rights because those procedures served to impermissibly suggest Williams as the person having the conversation in question with Herdeg and led to her later in-court identification of Williams.

The first step in analyzing a due process challenge to an in-court identification is to determine whether the challenged confrontation between the witness and the suspect was impermissibly suggestive. *Graham v. Solem,* 728 F.2d 1533, 1541 (8th Cir.), *cert. denied,* 469 U.S. 842, 105 S.Ct. 148, 83 L.Ed.2d 86 (1984). The State admitted at trial the impermissibly suggestive nature of the photospreads shown to Herdeg. Nevertheless, the suggestiveness of a photospread alone does not require exclusion of the subsequent in-court identification. *Id.; Neil v. Biggers,* 409 U.S. 188, 198–99, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972).

The second step calls upon a court to determine whether, under the totality of the circumstances, the identification might stand as reliable even though the initial out-of-court identification procedure contained suggestive elements. *Graham,* 728 F.2d at 1541; *Neil,* 409 U.S. at 199, 93 S.Ct. at 382. In *Neil v. Biggers,* the Supreme Court set forth five factors to consider in evaluating the likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the initial identification, and (5) the length of time between the crime and the initial identification. *Id.* at 199–200, 93 S.Ct. at 382.

Herdeg viewed the person who asked her for directions. It was approximately 10 a.m. and she was speaking to him, attempting to give directions. Ample opportunity existed for viewing the person. The circumstances disclose a likely degree of attention. Only she served as the attendant at a gas station convenience store. Herdeg testified that Williams asked for directions to the Domann house on October 5. She first picked Williams' picture out of the photo display on October 13. A delay of merely eight days between the time Herdeg saw the man who asked for directions and Herdeg's first identification of him does not significantly undermine the reliability of the identification.

These factors positively supporting proper identification, however, are outweighed on evaluation of the remaining factors, *i.e.,*

the accuracy of Herdeg's prior description of the man who asked for directions and the level of certainty she demonstrated at the time of the initial identification. The record does not show that Herdeg gave any description of the person prior to being shown the photographs. At the hypnosis session, however, she described the man as not wearing glasses. Williams wears glasses. The record is unclear as to the degree of certainty Herdeg evinced when she picked Williams' picture out of the photo display. However, even if we assume that she was fairly certain, the only photograph in the lineup of a man with a beard was the photo of Williams, thus diminishing the value of any certainty Herdeg may have evinced. Furthermore, Williams attended a deposition taken of Herdeg. Defense counsel questioned Herdeg as follows:

Q. You are aware that Mr. Williams is sitting right here beside me, are you not, or are you?

A. No.

Q. Does that man look like the man in the picture?

A. There is a familiarity.

Even when seated face-to-face with Williams after the suggestive photo lineups and the hypnosis session, Herdeg could not positively identify Williams. It thus appears that Herdeg made positive identifications of Williams only in suggestive settings; *i.e.*, at the impermissibly suggestive photo lineups and at trial where Williams was the known defendant.

The *Neil v. Biggers* analysis indicates that the totality of the circumstances surrounding Herdeg's identification suggests a substantial likelihood of misidentification. 409 U.S. at 198–99, 93 S.Ct. at 381–82. Moreover, the use of hypnosis to improve Herdeg's memory carries the risk of highly suggestive hypnosis procedures which adds to the likelihood of a misidentification.

Several problems are associated with refreshing recollections by hypnosis. In *Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112, 1119–20 (8th Cir.), *cert. denied*, 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1985), this court recognized that hypersuggestibility and hypercompliance on the part of the subject may flaw recollection under hypnosis. Hypnosis is also associated with confabulation, a tendency by the subject to be influenced by a need to fill in the gaps in his or her memory. After hypnosis, neither the hypnotist nor the subject can distinguish between real memories and pseudomemories confabulated under hypnosis. Furthermore, after hypnosis, the memory one has of an event, be it true or false, becomes hardened in the subject's mind. 771 F.2d at 1119–20. *See Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 2712–14, 97 L.Ed.2d 37 (1987).

[T]he basic problem for the courts is that hypnosis does not insure the accuracy of the witness' recall. Quite often hypnotized persons produce more information following hypnosis, but it may be accurate or inaccurate and there is no scientific technique that can reliably discriminate between true or false details recounted during hypnosis.

*Sprynczynatyk*, 771 F.2d at 1120 (footnote omitted).

The police kept no memoranda or notes of the hypnosis session in which Herdeg participated. The record, however, indicates that a police officer who participated in the investigation of Domann's murder conducted Herdeg's hypnosis and during that session showed Herdeg a single photograph, that of Doyle Williams. Thus, consideration of the admittedly suggestive photospread, the absence of any positive verification of Williams' identification prior to trial and the showing of Herdeg's uncertainty in fact of her identification of Williams, together with an uncontrolled hypnotic session in which Herdeg could be highly influenced to identify Williams, leads to the conclusion that the in-court identification must be rejected on due process grounds. The highly suggestive incidents which we have discussed caused a very substantial likelihood of either misidentification or an identification resting not on the witness' own recollection but induced by impermissible suggestions.

■ Although we determine that the identification testimony was error, the de-

termination does not justify relief under the facts of this case. In her testimony identifying Williams, Herdeg made reference to "they" when discussing who was in the car that stopped at the service station on October 5, thus suggesting that another person was with Williams when he asked Herdeg for directions. Williams defended himself at trial by arguing that Morgan committed the murder. Two defense witnesses testified at trial that Morgan, while in prison, had told them that he killed Domann and was going to frame Williams for the murder. In light of the entire record, the jury could conclude that Morgan accompanied Williams when Williams asked directions to Domann's residence. Thus, Herdeg's testimony did not erode Williams' defense and may even have bolstered it. Moreover, Herdeg's testimony cumulated the Purvis testimony placing a car Purvis later identified as Williams' vehicle in the vicinity of Dr. Domann's house on the morning of October 6. Purvis testified that she observed two people in that car. In light of Purvis' testimony identifying Williams' car near the Domann home on the morning of the murder, Herdeg's identification was in no way crucial to the State.

We conclude that Herdeg's identification of Williams would have made no difference in the trial—that such evidence alone did not contribute to the conviction and may have reinforced Williams' assertion that someone else, *i.e.*, Morgan, killed Domann. Accordingly, we deny Williams' petition for habeas relief. The Herdeg identification testimony amounted to harmless error beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Lam v. Iowa*, 860 F.2d 873, 876 (8th Cir.1988).

### B. *Effectiveness of Trial Counsel*

In *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the Supreme Court set forth a two-prong test for determining whether trial counsel's performance of his duties is so ineffective as to warrant reversal of a conviction. Williams must show, first, that his attorney's representation fell below an objective standard of reasonableness and, second, that his defense was prejudiced by his attorney's deficient performance.

Williams contends that he was denied his Sixth Amendment right to effective assistance of counsel at trial. He points to a number of areas where he alleges that his attorney's performance was deficient.

#### 1. Questioning of John Morgan

Williams contends that his attorney's failure to properly question John Morgan regarding Morgan's "deal" with the State and his prior inconsistent statements violated his Sixth Amendment right to effective assistance of counsel. The Missouri Court of Appeals addressed this issue on Williams' appeal of the denial of his petition for post-conviction relief and we are in complete agreement with its analysis of the issue.

Specifically movant challenges Marshall's failure to cross-examine Morgan on his "deal" with the state and on his prior inconsistent statements. Marshall readily acknowledged that his strategy, discussed with and concurred in by movant, was to avoid these areas in cross-examination of Morgan. He concentrated instead on Morgan's heavy drug addiction. This, combined with expert testimony as to the effects of such addiction on Morgan's mental condition, was designed to convince the jury of Morgan's unreliability as a witness and to frame the possibility of Morgan as the sole murderer.

Marshall had observed the Brummett trial [*] and three other trials in which exploration of the "deal" and inconsistent statements had been unsuccessful in producing an acquittal. He was also aware that in the Brummett trial, Williams' participation in the killing of

---

[*] We are aware that prior to the Domann trial, in a separate trial, Doyle Williams was convicted of the murder of Kerry Brummett and sentenced to death. An appeal from the denial of Williams' petition for writ of habeas corpus in that case is now pending in the Eighth Circuit. *Williams v. Armontrout*, No. 88–1342.

Domann had come before the jury and the jury had assessed the death penalty. The matter of the "deal" was the subject of questioning during the voir dire examination of the Domann jurors. The jury was aware therefore that Morgan was testifying in exchange for a promise of non-prosecution. Morgan's prior criminal record was brought out during his direct examination by the state. Marshall based his cross-examination upon his concern that by "opening the door" concerning the deal he would allow the prosecution to carry across the threshold a complete recitation of the crimes for which Morgan would not be prosecuted, including the murder of Brummett and the burglary of Domann. He also wanted to avoid establishment of the closeness between Williams and Morgan and their frequent activities together as it would strengthen a jury's perception that if Morgan did participate in Domann's murder he did so with Williams. These same concerns were present as regards the prior inconsistent statements. * * * As a result of Marshall's strategy, the jury was aware during the trial, including the punishment phase, only of Williams' complicity in the attempt to obtain a controlled substance by fraud. It imposed the lesser of the two punishments available to it.

We do not find anything about the choice of strategy unreasonable. * * *

Williams challenges his attorney's actions on the basis that exploration of the deal and the inconsistent statements would not have opened the door to testimony concerning his involvement in other crimes. * * * Clearly the nature and number of crimes for which Morgan was not to be prosecuted was relevant on the issue of his credibility. How far such an examination will be permitted to go in exploring the full scope of the deal is largely within the discretion of the individual trial court. * * * The door which Marshall feared opening could not have been closed if the judge determined during redirect that he would allow full exploration of the deal or the circumstances surrounding the inconsistent statements.

The information which might have been brought through that door could well have insured a death penalty. In fact movant stated that very argument in his appeal of his death penalty in the *Brummett* case. [*State v. Williams*, 652 S.W. 2d 102 (Mo. banc 1983).] It would be difficult indeed to conclude that counsel was ineffective in eschewing a strategy that proved unsuccessful in the death case when the different strategy pursued resulted in a lesser sentence here. We find nothing unreasonable about Marshall's strategy in carefully avoiding even cracking the door. We must defer to his judgment.

*Williams v. State*, 730 S.W.2d at 287–88.

### 2. Questioning of Kay Lepley

■ Williams argues that his attorney failed to properly cross-examine Kay Lepley and bring before the jury her "deal" with the State and her prior inconsistent statements. Lepley testified that she attended the shooting party at Barbara Rea's trailer where she observed Williams remove two guns from a briefcase and fire shots into the trash pile. The State had an agreement with Lepley that, in exchange for her testimony, it would not prosecute her for possession of a ruby ring stolen earlier from Domann's home by Williams and Morgan. The decision not to bring the agreement before the jury appears to rest on sound strategic reasons, the same reasons Williams' attorney did not cross-examine John Morgan on his non-prosecution agreement with the State. Counsel did not want to disclose to the jury the close relationship between Morgan and Williams or their criminal history together. As the state court noted, Williams' attorney utilized this strategy for good reasons and thus it does not amount to ineffective assistance of counsel.

In any event, any failure to further cross-examine Lepley also must be deemed harmless error. Lepley's testimony merely duplicated or corroborated the testimony of Randy Clardy and Barbara Rea about the shooting party on October 5, 1980. Thus, Williams cannot demonstrate, as required

by *Strickland v. Washington*, prejudice resulting from the alleged deficiency in his attorney's cross-examination of Lepley.

### 3. Failure to Object to Search and Seizure

Williams claims that his attorney's performance violated Sixth Amendment standards of reasonableness when he failed to object to the illegal search and seizure of Williams' car. The search turned up a .45 caliber Federal brand cartridge, the same brand used to kill Domann. The State placed the cartridge into evidence at trial.

Williams first contends that police officers lacked jurisdiction to obtain the warrant to search Williams' car. The state court, however, ruled to the contrary, and we defer to its reasoning on this issue.[1] *See Ricketts v. Adamson*, 483 U.S. 1, 107 S.Ct. 2680, 2683–84 n. 3, 97 L.Ed.2d 1 (1987) (in federal habeas corpus proceedings, the federal court is bound by state court interpretation of state law).

Williams also objects to the affidavit of John Morgan underlying the application for a search warrant as being too vague to support the issuance of the warrant. We have reviewed Morgan's affidavit and determine that it presents sufficient facts to permit a finding of probable cause under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Williams failed to demonstrate that Morgan, either knowingly and intelligently, or with reckless disregard for the truth, intended to make any false statement in the affidavit. *Id.* at 155–56, 98 S.Ct. at 2676.

Finally, Williams' contention that police conducted a generalized exploratory search is without merit. Williams argues that police officers were not interested in searching for drugs in Williams' car, but, rather, were looking for evidence which might link Williams to Domann's murder. However, Williams provides no evidence that police were engaged in an exploratory search. His argument, that police used the search for drugs in Williams' car as a way to obtain evidence in its investigation of Domann's murder, rests on speculation. Morgan's affidavit sufficiently demonstrated probable cause to believe the automobile carried drugs. Police thus conducted a legal search pursuant to a validly obtained warrant.

In any event, the admission of the cartridge into evidence alone did not substantially prejudice Williams. The State presented overwhelming evidence otherwise implicating Williams' .45 automatic pistol as the probable murder weapon. Expert testimony at trial revealed that Federal brand cartridges are common. The discovery of a single .45 caliber Federal brand cartridge in the trunk of Williams' automobile added little weight to the prosecution's case.

### C. State's Misconduct

#### 1. False Disclosure of the Morgan Deal

The State advised Williams' attorney that John Morgan had been granted immunity for crimes that took place outside of Callaway County. Williams argues, however, that the prosecutors of the other counties in which the crimes occurred never granted such immunity. This false disclosure, he contends, prejudiced Williams because it would, in some way, have affected the way his attorney questioned Morgan. We again defer to the state court's determination of the applicable state law.[2]

---

**1.** Movant also contends that the state illegally obtained evidence by use of fraud. This is based upon movant's conclusion that members of the major case squad lack the authority to act as police officers outside the county for which they work. Sec. 57.111 RSMo 1979 authorizes temporary commissions. There was evidence that it is standard practice for major case squad members to be given temporary commissions in the county wherein they are working. We believe such authority is inherently bestowed by the acts of the sheriffs in each county agreeing to the formation of the major case squad initially.
*Williams v. State*, 730 S.W.2d at 288–89.

**2.** Movant's points, five in number, alleging prosecutorial misconduct are similarly lacking in merit. The main issue raised is that the prosecution misled movant and his attorney into believing that Morgan had received freedom from prosecution for all crimes he disclosed including those committed outside Callaway County, the county of the prosecutor making the "deal".

### 2. Coercion of Barbara Rea

At the hearing on Williams' motion for new trial, Barbara Rea testified that police in the Major Case Squad investigating Domann's murder threatened to take her child away from her. Williams contends that this threat alone requires reversal of his conviction because Rea could have refuted Herdeg's identification of Williams at the gas station the morning before the murder.[3] Williams claims that he was at Barbara Rea's home, some fifty miles from the gas station, on October 5, 1980, at 9 a.m., the same time Herdeg testified Williams had asked her for directions. Rea, however, testified that although Williams visited at her home on October 5, she could not state the time of that visit with any certainty.

Williams suggests that if Rea had not been threatened, she would have remembered that Williams was at her home at 9 a.m. on October 5, 1980, thus undercutting Herdeg's identification. However, as discussed earlier in this opinion, admission of Herdeg's identification constituted harmless error. Williams has not established that the coercion, if any, affected the testimony of Barbara Rea and we therefore reject this claim.

Williams also argues that his attorney's failure to cross-examine Rea concerning the threats by the State amounted to ineffective assistance of counsel. Williams, however, failed to demonstrate that his attorney knew of the alleged threats prior to trial. Thus, a failure to cross-examine Rea on this issue cannot be deemed ineffective assistance of counsel.

It is contended this misinformation prevented movant from cross-examining Morgan as effectively as he could have with the correct information. We do not find the evidence compelling that in fact other prosecutors had not agreed not to prosecute. But it makes no difference. The Callaway county prosecutor is an agent of the state. The agreement was by the state acting through the prosecutor. The state is bound by the deal and that includes prosecutors in other counties within the state. *State v. Burson,* 698 S.W.2d 557 (Mo.App.1985); *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). There was no misleading by the prosecution.

### III. CONCLUSION

In accordance with the foregoing, we affirm the judgment of the district court denying Williams' petition for writ of habeas corpus.

JOHN R. GIBSON, Circuit Judge, concurring specially.

I concur in the judgment of the court today. I am in agreement with the analysis the court makes with only one exception. I believe that discussion of the hypnosis procedures is not necessary to reach the conclusion that the identification of Williams by Dedra Herdeg fails the *Neal v. Biggers* analysis. I would leave to another day further consideration of the hypnosis issue.

---

*Williams v. State,* 730 S.W.2d at 288.

**3.** The State contends that Williams never presented this claim to the trial court and, although presented to the appellate court, the state court dismissed it on procedural grounds rather than on the merits. The appellate court, however, stated, "[m]ovant's points, five in number, alleging prosecutorial misconduct are similarly lacking in merit." *Williams v. State,* 730 S.W.2d at 288. Thus, the state court ruled on the merits of the claim and Williams, therefore, is not barred from presenting it to this court.