Kathleen **FRYMIRE–BRINATI** and Michael **Brinati, Plaintiffs–Appellees,**

v.

**KPMG PEAT MARWICK, Defendant–Appellant.**

No. 92–1083.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1992.

Decided July 29, 1993.

Anthony C. Valiulis, Stewart M. Weltman, Deborah Schmitt Bussert, Michael J. Freed (argued), Christopher J. Stuart, Michael R. Shelist, Much, Shelist, Freed, Denenberg & Ament, Chicago, IL, Roger B. Greenberg, Richie & Greenberg, Houston, TX, Jack Dawson, Miller, Dollarhide, Dawson & Shaw, Oklahoma City, OK, for plaintiffs-appellees.

Jeffrey R. Tone (argued), Linton Jeffries Childs, Robert R. Watson, Frank B. Vanker, Robert D. McLean, Sidley & Austin, Chicago, IL, for defendant-appellant.

Before BAUER, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Patrick E. Powers developed real estate in Norman, Oklahoma. He organized the business through a central corporation, Pepco, Incorporated, that was the general partner in a series of limited partnerships investing in particular properties. Each partnership raised outside money from limited partners. Richard A. Frymire and his daughter Kathleen Frymire–Brinati invested in some of these partnerships and owned some common stock of Pepco itself. In 1982 Frymire–Brinati was elected to Pepco's board as an "advisory" director.

In December 1984 Powers asked Frymire for assistance. Powers told Frymire that he was hoping to arrange a merger but that to look attractive Pepco would need to show greater liquidity on its books. Powers asked Frymire to invest $1 million in preferred stock paying 12% per annum, with the understanding—not written down, lest it spoil the impression—that Pepco would redeem the stock on Frymire's request. Frymire informed his daughter and her husband Michael Brinati. Daughter and son-in-law decided to oblige Powers and purchased the preferred stock on December 31, 1984. But this did not fool the auditor. Peat, Marwick, Mitchell & Co., now called KPMG Peat Marwick, smelled a rat and resigned without completing the audit of the 1984 financial statement. Only the Frymires and Brinatis were fooled. Pepco and its empire of partnerships collapsed, a receiver was appointed in October 1985, and Powers signed an administrative consent order. Powers denied that he had bilked any investors and promised not to do it again. Oklahoma prosecuted Powers for fraud, embezzlement, and the sale of unregistered securities; in 1988 Powers was acquitted of the former two charges and convicted of the latter. He served no time in jail but was suspended for one year from the practice of law. *Oklahoma ex rel. Oklahoma Bar Association v. Powers*, 781 P.2d 832 (Okla.1989).

Out one million dollars in addition to their earlier investments, Frymire–Brinati and her husband filed this suit against the only solvent party: Peat Marwick. According to the complaint, Peat Marwick committed securities fraud in certifying Pepco's 1983 financial statements, on which, the plaintiffs said, they had relied in making their investment. Pepco's principal assets were its stakes in the partnerships, which Peat Marwick certified were carried at the lesser of cost or market. Each of these investments was shown at cost, even though, according to plaintiffs, Peat Marwick knew (or was reckless in failing to discover) that they were worth far less. Plaintiffs also observed that Powers had pulled a similar stunt at the end of 1983, obtaining a short-term infusion of cash to make the books look good—but in early 1984 Powers repaid this money, a step he did not complete with plaintiffs. Peat Marwick failed to discern this earlier financial flim-flam. Judge Moran removed from the case all claims except those under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), the SEC's Rule 10b–5, 17 C.F.R. § 240.10b–5, and state law. 657 F.Supp. 889 (N.D.Ill.1987). The case was assigned to Judge Lindberg for trial, which lasted six weeks in 1991. A jury returned a verdict for plaintiffs on all claims, awarding them $1 million in compensatory and $2 million in punitive damages. The district judge denied Peat Marwick's motion for a new trial, remarking that "[t]he evidence was rich and provided a deep reservoir of bases to support a jury verdict for either party on each and every count." "The testimony of· witness Hassett, without more, was adequate to satisfy [the required] standards." 1991 WL 268047, 1991 U.S.Dist.Lexis 17909.

William Hassett, manager of the Chicago accounting firm of Altschuler, Melvoin & Glasser, was the plaintiffs' star witness, and the only one the judge mentioned. Hassett testified that in conducting the audit of Pepco's 1983 financial statements (which we call the "1983 audit" even though it occurred in 1984) Peat Marwick violated seven of the ten Generally Accepted Auditing Standards (GAAS). The standard to which the parties have devoted most attention is that auditors certify that the accounts have been stated according to Generally Accepted Accounting Principles (GAAP). Peat Marwick so certified, but this was false, Hassett testified, because Pepco's investments in the partnerships were not worth what they were represented as being worth. GAAP calls for the use of the lesser of cost or market value. Hassett concentrated on the latter, testifying that as a first approximation the investments were worthless. Why worthless? Hassett used a discounted cash flow analysis, valuing the partnerships' projects at ten times their annual cash flow. Many of these projects had low or negative net cash flows; Hassett accordingly assigned them a value of zero.

Needless to say, this led to great controversy at trial. Hassett's method implies that raw land is worthless and that a large office building in the final stages of construction also has no value even though it is fully leased out and could be sold for a hundred million dollars. Eventually Hassett conceded that his valuations were not "market values" at all but were "a fairly simple pass at what the magnitude of the problem was". To determine a market value using a discounted cash flow analysis, one must consider potential cash flows (for example, what the office building will produce after occupancy) and not simply historical cash flows. Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* 62–66, 191–96 (3d ed. 1988). See Lucian Arye Bebchuk & Marcel Kahan, *Fairness Opinions: How Fair Are They and What Can Be Done About It?*, 1989 Duke L.J. 27, 35–37, for a description of the requirements of discounted cash flow analysis and the difficulty of doing it well.

■ Admitting Hassett's "fairly simple pass" into evidence just because he is an expert in accounting is problematic, for Hassett conceded that he did not employ the methodology that experts in valuation find essential. A "trial judge must ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, — U.S. —, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Federal Rules of Evidence require a judge to undertake "a preliminary assessment of whether the reasoning or methodology underlying the testi-

mony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at ——, 113 S.Ct. at 2790. See also *Mid–State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333, 1339–40 (7th Cir.1989); *Deltak, Inc. v. Advanced Systems, Inc.,* 574 F.Supp. 400, 405–06 (N.D.Ill.1983), vacated on other grounds, 767 F.2d 357 (7th Cir.1985). The trial judge did not conduct such a "preliminary assessment" before permitting Hassett to testify about his method. Although district judges possess considerable discretion in dealing with expert testimony, *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990), on this record the court could not properly have admitted Hassett's valuation. Fed.R.Evid. 702.

■ After Hassett was done, Peat Marwick tried to put things in a better light with experts of its own. Richard Behrens, chairman of the Real Estate Committee of the American Institute of Certified Public Accountants, testified that Hassett had bungled by using historical rather than projected future income in his cash flow analysis. In an effort to move from theory to concrete valuation, Peat Marwick offered James Hoyt, a real estate appraiser with 28 years' experience in the Oklahoma market, to testify about the accuracy of the property values in the financial statements. The district judge prevented Hoyt from testifying, ruling that Hoyt had not laid a proper foundation for his testimony during the deposition taken three months before trial. Peat Marwick wanted to use Hoyt to respond to Hassett, and Hassett himself did not disclose the nature of his proposed testimony until shortly before trial, after Hoyt's deposition. It is difficult to see how Hoyt could have laid out details of the response before learning what he was responding to. After preventing Hoyt from testifying, the trial judge severely limited the testimony of Abbie Smith, a professor of accounting at the University of Chicago's Graduate School of Business. Professor Smith would have testified that financial statements dated December 31, 1983, would not have been material to a reasonable investor asked to make an investment a year later—especially one serving on the issuer's board. Again the trial judge ruled that the

witness had not disclosed this opinion sufficiently far in advance of trial, even though he permitted Hassett and two other witnesses for the plaintiffs (Carl Pojezny and Dennis Maley) to give extensive testimony that had not been disclosed until the last minute.

■ Similarly one-sided rulings on evidentiary matters occurred throughout the trial. In response to discovery requests and pretrial motions, Peat Marwick made a number of statements that plaintiffs believed were damaging admissions. They compressed these statements into a three-page narrative, omitting the context of (and qualifications on) the admissions. The district judge permitted the plaintiffs to introduce these three reconstructed pages into evidence, and the plaintiffs trumpeted the admissions to the jury. Peat Marwick asked the judge to direct plaintiffs to restore the statements to their context; the judge declined. Then Peat Marwick invoked Fed.R.Evid. 106: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." See also *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 170–73, 109 S.Ct. 439, 450–51, 102 L.Ed.2d 445 (1988). Despite Rule 106 the judge refused to allow Peat Marwick to restore the admissions to their context or to inform the jury about the qualifications. If, as the judge believed, the qualifications were quibbles, and the context was tendentious argument, then Peat Marwick proposed to do itself injury in the eyes of the jury. An admission depicts the party in its own words; Peat Marwick was entitled to have the jury see those words rather than a precis that the adverse party thought would depict the speaker in the worst light.

■ Peat Marwick audited Pepco but not the partnerships. Powers' consent order concerned his operation of the partnerships but not Pepco. Nonetheless, plaintiffs offered the consent order to show that Powers had committed fraud. The order, drafted by the Oklahoma Department of Securities, contains a recitation of that Department's "find-

ings," which Powers neither conceded nor denied. Peat Marwick objected to the introduction of this document, observing not only that it concerned the partnerships rather than Pepco but also that several courts have held such uncontested consent orders, like pleas of *nolo contendere*, to be inadmissible. *Spencer Livestock Commission Co. v. Department of Agriculture*, 841 F.2d 1451, 1458 (9th Cir.1988); *Kloepfer v. Honda Motor Co.*, 898 F.2d 1452, 1456–57 (10th Cir.1990). Nonetheless the district court admitted this document, and plaintiffs argued the "findings" to the jury as if they concerned Pepco, as if they were the outcome of an adversarial process, and as if Oklahoma's administrative officials had made their charges against Peat Marwick as well as Powers. On several occasions the judge required Peat Marwick's witnesses, while being cross-examined, to *assume* that the "findings" were true and to answer accordingly. In an effort to curtail the damage, Peat Marwick tried to tell the jury that there had been an actual adjudication: a jury acquitted Powers of fraud and embezzlement. Having let in the state's unadjudicated charges, the judge kept out the acquittal. Once again the jury received a one-sided picture.

■ One final example. During its 1984 audit (that is, the audit of Pepco's 1984 financial statement) Peat Marwick discovered facts that raised serious concerns about Pepco's operations and ultimately led Peat Marwick to withdraw. Jack E. Finley, one of Peat Marwick's partners, prepared a memorandum listing some of the irregularities. This "red flag" memo was introduced in redacted form to show that Peat Marwick should have been able to find the same problems during its 1983 audit. Peat Marwick objected on the ground that nothing in the record established that the circumstances leading to the discoveries during the 1984 audit were present during the 1983 audit. Having ruled before trial that the red flag memo and related 1984 audit workpapers would be excluded unless plaintiffs could establish that Peat Marwick knew these facts (or recklessly failed to discover them) during the 1983 audit, the district judge reversed course and admitted the documents on Hassett's unsupported belief that Peat Marwick

must have known. Peat Marwick then invoked Rule 106 in an effort to introduce the entire red flag memo and the rest of the workpapers. Without stating any reason, the trial judge refused to allow Peat Marwick to introduce the whole memo. The judge was considerably more generous with plaintiffs, who with the court's permission (and over vigorous objection) told the jury that the Oklahoma branch of Peat Marwick that handled Pepco had audited the 1981 financial statements of Penn Square Bank, whose collapse nearly demolished Continental Illinois Bank. Peat Marwick was not charged with wrongdoing in connection with that audit, but the damage was done, and with the court's consent.

■ One or two of these errors might have been excused as harmless. Collectively, however, they presented the jury such a skewed picture that the verdict is unreliable and must be set aside. The tough question on this appeal is whether there is any need for another lengthy trial.

Plaintiffs offered three theories: that Peat Marwick committed fraud in violation of § 10(b) and Rule 10b–5; that Peat Marwick aided and abetted Powers' fraud, violating the same statute and rule; and that Peat Marwick committed fraud under the common law of Illinois. Yes, Illinois. Pepco was an Oklahoma corporation, Peat Marwick performed its audit in Oklahoma, and Powers initiated the transaction from Oklahoma. But plaintiffs live in Illinois, and the parties have agreed that Illinois law governs the claims under the supplemental jurisdiction of 28 U.S.C. § 1367. Litigants are free to stipulate to the application of a particular state's law, so we accept their agreement that Illinois law applies.

■ Whether there is a private right of action for aiding and abetting a violation of § 10(b) and Rule 10b–5 is a question now before the Supreme Court. *First Interstate Bank of Denver, N.A. v. Pring*, 969 F.2d 891 (10th Cir.1992), cert. granted under the name *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, — U.S. —, 113 S.Ct. 2927, 124 L.Ed.2d 678 (1993). Our circuit has recognized such a private right of

action but has limited recovery to cases in which the assistance included at least one act of deceit with the same degree of scienter required for the primary violation. E.g., *Robin v. Arthur Young & Co.,* 915 F.2d 1120, 1123 (7th Cir.1990); *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 946–48 (7th Cir.1989); *LHLC Corp. v. Cluett, Peabody & Co.,* 842 F.2d 928, 932 (7th Cir.1988); *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 495 (7th Cir.1986). What, then, was the primary violation? Well, it might be Powers' oral misrepresentation to Frymire that the preferred stock would be redeemed on demand, but nothing in the record suggests that Peat Marwick knew about, let alone that it assisted, this deceit. Plaintiffs contend that the primary violation was Powers' fraudulent solicitation of funds for the partnerships. Peat Marwick was not the partnerships' auditor, however, and again nothing suggests that Peat Marwick assisted this violation (if there was one) with any concrete step, let alone with intent to defraud. Lending one's good name to a person who turns out to be a crook does not establish liability as an aider or abettor, *Latigo Ventures v. Laventhol & Horwath,* 876 F.2d 1322, 1327 (7th Cir.1989), but in the end plaintiffs offer nothing more. Acting in a parallel proceeding, a sister circuit has held that Peat Marwick did not aid or abet any violation by Powers or Pepco. *Farlow v. Peat, Marwick, Mitchell & Co.,* 956 F.2d 982 (10th Cir.1992). We agree. This record does not support a judgment for plaintiffs on the aiding-and-abetting theory.

Was Peat Marwick's certification of Pepco's 1983 financial statement itself a primary violation? Section 10(b) and Rule 10b–5 forbid fraud "in connection with" the purchase or sale of securities. The "connection" requirement must be taken seriously. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Financial statements frequently are used in documents selling securities, which furnishes the necessary "connection," see *In re Ames Department Stores Inc. Stock Litigation,* 991 F.2d 953 (2d Cir.1993), but Peat Marwick did not authorize the use of the 1983 financial statement in any registration statement, prospectus, or equivalent document. Any audi-

tor's opinion *might* be used in connection with the sale of securities, but most financial statements serve to assist existing investors who seek to know the status of their firm and desire to monitor the managers. To find the "connection" just because the managers, unbeknownst to the auditors, show the financial statement to some potential investor would abolish the requirement that the defendant's acts occur "in connection with" the purchase or sale of securities.

Whether accountants and other professionals *ought* to be liable to all investors who rely on their work product is an interesting question. Dealing with state law, Judge Cardozo concluded that accountants are liable only if they intend the use eventually made of the financial statement. *Ultramares Corp. v. Touche, Niven & Co.,* 255 N.Y. 170, 174 N.E. 441 (1931). To establish liability the plaintiff must show that the auditor (or other professional) was aware that the report would be used for a particular purpose, in furtherance of which a known third party would rely, and the professional must show an understanding of this impending reliance. *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 443, 483 N.E.2d 110, 118 (1985). Some states have followed *Ultramares;* a larger number have rejected it and held auditors liable without regard to their knowledge about the use to be made of the financial statements. See *Prosser & Keeton on Torts* 744–47 (5th ed. 1984). We have been reluctant to use the federal securities laws to cut off this debate and establish national liability without regard to knowledge. See *Ackerman v. Schwartz,* 947 F.2d 841 (7th Cir.1991). In *Ackerman* we searched for a connection between the professional report (there, an attorney's comfort letter concerning a tax shelter) and the sale of securities by asking whether the professional knew or should have appreciated that his report would be used to sell securities. Although *Ackerman* addressed the professional's duty to investors rather than the "in connection with" language, *id.* at 846–47, the second circuit has used fundamentally the same approach to define the required "connection." *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 941–43 (2d Cir.1984).

See also *SEC v. Drysdale Securities Corp.*, 785 F.2d 38 (2d Cir.1986).

■ No direct evidence establishes that Peat Marwick knew that the audited 1983 financial statement would be used to offer any securities, let alone the preferred stock sold in the private transaction at the end of 1984. Powers did not testify that he informed Peat Marwick's auditors that such a use was possible; the auditors themselves denied having such knowledge. Plaintiffs' case for the requisite knowledge rests on two propositions: first, Peat Marwick knew that Pepco had investors and therefore must have recognized that it might solicit more; second, Peat Marwick furnished Pepco with 450 copies of the financial statement and should have known that the copies would be used to solicit new funds. The first of these inferences would nullify the "in connection with" requirement because *every* auditor knows that corporate entities whose statements he reviews have investors. Yet many corporations go years between public (or private) offerings of securities, and before they make such offerings most firms consult with their accountants and obtain consent to the use of the financial statements. Accountants such as Peat Marwick give financial statements special reviews before allowing the firm's name to be used in selling securities, and Finley testified that Peat Marwick had expressly instructed Powers not to use the financial statement in capital-raising without the auditors' consent. Pepco gave no notice and obtained no consent. (Recall that the one charge on which Powers was convicted was the sale of unregistered securities; he omitted the steps that would have brought the auditors into the process of sale.)

Everything therefore comes down to the 450 copies. Was this number so large that it implied knowledge of an impending solicitation? Finley, the Peat Marwick partner through whom plaintiffs introduced this evidence, denied that 450 copies was out of the ordinary. Corporations distribute financial statements to the officers and board, to existing investors, to state regulators, to vendors of goods that want to decide whether to extend credit, to banks that seek knowledge on which to make or set the interest rate on loans, and so on. Frymire–Brinati received a copy in her capacity as a member of the board, independent of any effort to use the financial statement as a selling document, and testified that she had received Pepco's financial statements even before joining its board. Pepco and its associated partnerships were a substantial enterprise. Plaintiffs called a number of accountants but did not ask any of them whether 450 was an implausibly high number of copies for a firm of this size that did *not* plan to sell new securities. Although plaintiffs invited the inference from number to sale—"Why else would so many be needed?" they ask—there is no foundation for the inference. During 1984 Pepco sold stock only to plaintiffs, and that sale did not influence the number of copies Pepco needed. Apparently, then, Pepco used its 450 copies for other purposes. Neither jurors nor judges know how many copies are "normal," and without that knowledge the proposed inference is more like a leap of faith. Jurors are not allowed to make unguided leaps. The number of copies of financial statements that is ordinary for a firm of a given size is not the kind of issue, like the reasonableness of driving at a particular speed at night, on which jurors may consult their own experience or intuition. Finley supplied the only evidence on this subject—that 450 is ordinary, giving no clue that they the issuer would use the copies to sell securities. On this subject plaintiffs bear the burden of persuasion. Consequently Peat Marwick is entitled to judgment on the § 10(b) and Rule 10b–5 claim.

■ All that remains is the claim under state law. Illinois does not follow *Ultramares,* see *Rozny v. Marnul,* 43 Ill.2d 54, 250 N.E.2d 656 (1969); *Greycas, Inc. v. Proud,* 826 F.2d 1560, 1564–65 (7th Cir.1987) (discussing Illinois law), so Peat Marwick may be liable even if it did not know that Pepco would use the financial statement to sell new stock. Illinois does, however, insist that the plaintiff prove, by clear and convincing evidence, that Peat Marwick made a materially incorrect statement, with knowledge of falsity (or reckless disregard of its falsity), and that the investors reasonably relied to their detriment. See *Astor Chauffeured Limou-*

*sine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1549–51 (7th Cir.1990) (discussing Illinois law in the context of another securities case); *Cole v. Ignatius*, 114 Ill.App.3d 66, 74, 69 Ill.Dec. 820, 826, 448 N.E.2d 538, 544 (1st Dist.1983). It is harder to prevail under Illinois law than under federal law because of the greater burden of persuasion (clear and convincing rather than preponderance) and because of the reasonable-reliance requirement, which federal securities law does not contain except to the extent it bears on the determination of materiality. See *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 528–31 (7th Cir.1985).

Frymire–Brinati may have considerable difficulty persuading a jury that hears all of the evidence (as the jury in this case did not) that she reasonably relied on Peat Marwick's certification of the 1983 financial statement. She was not only a director of Pepco but also a participant in a plan to create an illusion of liquidity as part of an effort to sell the firm. But Peat Marwick does not contend that a properly instructed jury *could* not rule in her favor on this ground, or that Illinois has an *in pari delicto* doctrine more rigorous than that of federal law. See *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). Instead it concentrates on the scienter requirement. Why, it asks, would it help Powers hoodwink investors? For the 1983 audit Peat Marwick collected less than $25,000. It would be insane to facilitate a securities fraud, and expose itself to huge liabilities, in exchange for this paltry sum, Peat Marwick insists, adding that when in the course of the 1984 audit it got a whiff of fraud it immediately withdrew. Maybe so, but the state of mind of the local auditors is imputed to the partnership, and one of the auditors in Oklahoma may have been trying to boost Pepco in the hope of enlarging the stream of revenues in future years. Cf. *Dexter Corp. v. Whittaker Corp.*, 926 F.2d 617, 620–21 (7th Cir.1991); *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1043 (7th Cir. 1990) (both discussing Illinois law). Some evidence in the record suggests such a possibility. Auditors at Peat Marwick's Oklahoma office sent Powers letters stressing the importance of that firm to Peat Marwick's practice and stating that Peat Marwick was discounting its fees in order to make an "investment" in Pepco's future. That Pepco's business accounted for less than 1% of the office's billings does not *compel* a jury to treat the letters as puffing.

What else was there? Take away Hassett's cash flow analysis, and what remains was still enough to permit a jury to conclude that Peat Marwick acted in an inexplicably casual manner suggesting reckless indifference to the truth of the matters asserted in the financial statement. The record contains the "red flag" memo and supporting workpapers from the abandoned 1984 audit. For 1983 the cupboard is bare. Peat Marwick has few workpapers of any kind from that year—and Powers, who shredded a good portion of Pepco's documents, did not leave behind the means to fill the gap. Pepco valued *all* of its investments in the partnerships at cost. For this to be appropriate, all of the investments must have increased in worth (GAAP requires the lesser of cost or market value). Peat Marwick could not produce any documentation. Finley, the Peat Marwick partner responsible for final review of the 1983 audit, testified that Robert Troccoli (who actually did the work) attended a day-long meeting with Pepco's management, during which Pepco produced insurance binders and real estate appraisals verifying the increasing value of the partnerships' real estate investments. Which properties? Finley could not say. Had Peat Marwick done any independent verification, such as contacting the insurers or appraisers to ensure that these had indeed attached rosy values to the partnerships' property? Finley believed that Dugan and Troccoli had, but the 1983 workpapers do not support this belief. None documents any effort at independent verification. Even moderately determined defrauders (as a jury might have found Powers to be) will have a few documents that they can wave under an auditor's nose. These may be spurious or furnished by outsiders in cahoots with the defrauder; the only way to find out is to do a little checking. Pepco's largest asset was a note from Pepco Mortgage Corporation. That would have been the logical place to conduct a spot check; this record supports a conclusion that Peat Marwick did not check up at Pepco Mortgage and that

even a simple inquiry would have revealed serious problems (as the more thorough audit in 1984 did). Troccoli testified that he inspected one of the properties and found it "in excellent condition." The jury did not have to believe this testimony. A jury may conclude that an auditor's failure to check on *anything* he is told not only falls short of GAAS but also reflects such indifference to truth as to be reckless. Cf. *Escott v. Bar-Chris Construction Corp.*, 283 F.Supp. 643, 697–703 (S.D.N.Y.1968) (passive acceptance of issuer's representations does not satisfy an auditor's duties under § 11 of the Securities Act of 1933).

Although a jury might conclude that Peat Marwick is liable under the common law of Illinois, *this* jury's verdict is unreliable for reasons we have already covered. Plaintiffs are entitled to another trial. Now that the federal claims have been resolved, there is no particular reason for that trial to occur in federal court. (The parties are not of diverse citizenship.) The judgment is reversed, and the case is remanded. The district court shall enter judgment for Peat Marwick on all federal claims and apply the criteria of 28 U.S.C. § 1367(c) to determine whether further proceedings on the common law claim should occur in state or federal court.