**In re QWEST COMMUNICATIONS INTERNATIONAL, INC.
Securities Litigation**

Nos. CIV. 01–RB–1451 (CBS), CIV.A. 01–RB–1472, CIV.A. 01–RB–1527, CIV.A. 01–RB–1616, CIV.A. 01–RB–1799, CIV.A. 01–RB–1930, CIV.A. 01–RB–2083, CIV.A. 02–RB–333, CIV.A. 02–RB–798.

United States District Court,
D. Colorado.

Jan. 13, 2004.

Michael J. Dowd, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, Jeffrey Allen Berens, Dyer & Shuman, LLP, Denver, CO, for Plaintiff.

Terence C. Gill, Marcy M. Heronimus, Sherman & Howard, Denver, CO, David R. Boyd, Milberg, Weiss, Bershad, Hynes, San Diego, CA, Alfred P. Levitt, Jonathan D. Schiller, Boies, Schiller & Flexner, Washington, DC, Kirsten E. Gillibrand, Boies, Schiller & Flexner, LLP, New York City, Kenneth F. Rossman, IV, Boies, Schiller & Flexner, LLP, Denver, CO, Donald C. McLaughlin, Jr., Steamboat Ski & Resort Corporation Risk Manager, Steamboat Springs, CO, John Frederick Cove, Jr., David W. Shapiro, Boies, Shiller, & Flexner, Oakland, CA, for Defendant.

## ORDER CONCERNING DEFENDANTS' MOTIONS TO DISMISS

BLACKBURN, District Judge.

This matter is before me on the following motions: 1) defendant Qwest Communications International Inc.'s Motion to Dismiss the Fourth Consolidated Amended Complaint [# 153], filed October 31, 2002; 2) the Individual Defendants' Motion to Dismiss the Fourth Consolidated Amended Complaint [# 116], filed September 20, 2002; and 3) defendant Arthur Andersen LLP's Motion to Dismiss Fourth Consolidated Amended Class Action Complaint [# 114], filed September 20, 2002. I will refer to the Fourth Consolidated Amended Complaint as the Complaint. The motions to dismiss filed by Qwest and the individual defendants are granted in part and denied in part. Arthur Andersen's motion to dismiss is granted in part and denied in part.

### FACTS

Qwest is a communications company which provides telephone service and a wide variety of other communications services in the United States and internationally. Qwest began selling its shares publicly in June, 1997. The plaintiffs allege that Qwest and the other defendants is-sued false and misleading statements about Qwest's financial performance in the period from May 24, 1999, to February 14, 2002. These statements, the plaintiffs allege, caused a factitious inflation in Qwest's stock price. In the end, Qwest's stock price fell from a high of over $50 per share to a low around $7.27 per share at the end of the class period. The plaintiffs allege that they suffered losses connected with their purchase of Qwest's publicly traded securities and that these losses were caused by the defendants' false and misleading statements about Qwest's financial performance.

In June, 1999, Qwest made an offer to acquire U.S. West, a baby bell, and Frontier Corporation for sixty-six billion dollars in stock, cash and assumed liabilities. US West shareholders approved the merger in November, 1999. The merger could not be completed, however, until it was approved by the Federal Communications Commission and various state agencies. To protect U.S. West shareholders during this interim period, the parties agreed to impose a collar price on Qwest stock. The parties agreed that if Qwest's stock price was below $38.70 per share at the time the merger was to be completed, Qwest would pay a portion of the purchase price in cash. The plaintiffs claim that the defendants' accounting manipulations were motivated, in part, by a desire to keep Qwest's stock price above $38.70 as the merger was completed. The merger was completed in June, 2000.

The plaintiffs allege that the defendants engaged in 18 different improper accounting manipulations in an effort to make Qwest appear to be more profitable and more valuable than it really was during the class period. These accounting manipulations are detailed in the Complaint and are listed in Qwest's motion to dismiss. I will summarize some of the alleged manip-

ulations here for the purpose of outlining the scope and magnitude of the fraud alleged by the plaintiffs.

One of the primary manipulations alleged by the plaintiffs is recognition of revenue from indefeasible right of use (IRU) contracts. In these contracts, Qwest would agree to sell access to fiber optic network capacity to another company at a certain price. Generally, the IRU contracts were multi-year agreements in which Qwest was obligated to keep capacity available for its customer over a period of years. The company purchasing the capacity would pay Qwest over the term of the contract. *Complaint,* ¶ 48. The plaintiffs allege that these "contracts were often made at inflated prices which customers would agree to pay only because Qwest agreed to buy services or capacity from the same customers at similarly inflated prices." *Id.* These transactions sometimes are called reciprocal transactions or capacity swaps.

The plaintiffs allege that Qwest would recognize all of the anticipated revenue from such multi-year transactions in the quarter in which the contracts were executed, even though the contracts provided for payments to Qwest over time. The plaintiffs allege that such revenue recognition violates Generally Accepted Accounting Principles (GAAP). Further, the plaintiffs allege that many of Qwest's IRU swap transactions did not have economic substance, but were arranged solely to inflate revenues for both Qwest and the other companies involved in the deals. *Complaint,* ¶ 104. According to the Complaint, Qwest used these transactions to inflate the amount of revenue recognized by Qwest's Commercial Services division during the class period. For example, the plaintiffs allege that improper accounting for IRU swap transactions permitted Qwest to boost the reported revenue of its Commercial Services division by 10 per-

cent, or 230 million dollars, in the third quarter of 2000, and by 15 percent in the first quarter of 2001.

The plaintiffs allege that Qwest failed to disclose the nature of these transactions and the role such transactions played in inflating Qwest's reported revenue. *Complaint,* ¶ ¶ 48—61. According to the plaintiffs, Qwest recorded hundreds of millions of dollars in revenue based on such transactions in 2000 and 2001. The plaintiffs allege that recognition of this revenue violated GAAP. Further, the plaintiffs claim that these transactions were highly significant to investors because capacity asset sales are non-recurring in nature. *Complaint,* ¶ 61 The plaintiffs claim Qwest was able to significantly overstate its revenue growth percentages during the class period by hiding the non-recurring nature of this revenue. *Id.* The plaintiffs allege that reported revenue from such transactions caused Qwest's financial reporting to be materially false and misleading from the second quarter of 2000 through the end of 2001.

Revenues for the consumer and small business division were inflated, the plaintiffs allege, when Qwest would recognize revenue on sales of internet services. For example, when an order provided for payment by a customer for the number of minutes a line was utilized, Qwest would grossly over estimate the number of minutes such customers would buy, and then would immediately recognize revenue based on this over estimation. *Complaint,* ¶ ¶ 80—81. The plaintiffs allege that these so-called "flash" sales routinely were overstated by 60 percent to 70 percent. This manipulation, the plaintiffs claim, caused Qwest's revenues to be materially overstated from the first quarter of 1999 through its reports covering the second quarter of 2000.

The plaintiffs also allege that Qwest's year 2000 financial results benefited from a pension credit of $299 million. This credit was equal to about 16 percent of Qwest's operating income for that year. According to the plaintiffs, Qwest did not disclose the source of this credit until the SEC forced Qwest to amend its year 2000 form 10–K in August of 2001. The plaintiffs claim that Qwest materially misstated its financial condition when it failed to disclose the source of this credit.

In late 2000, the plaintiffs assert, the defendants sought to manipulate revenue from the Directory Services Division in order to recognize additional revenue in the fourth quarter of 2000. The plaintiffs allege that the defendants arranged to advance the publication date for the Colorado Springs directory from January, 2001, to December, 2000, and to extend the term of that directory from 12 to 13 months. By advancing the publication date, Qwest was able to recognize revenue from this directory in the fourth quarter of 2000. Further, Qwest recognized 13 months of revenue from this directory rather than 12 months of revenue. This manipulation, the plaintiffs allege, permitted Qwest to claim Directory Services revenue growth of 10 percent in 2000, rather than five percent. According to the plaintiffs, Qwest recorded an additional 28 million dollars in revenue in 2000 based on the change in publication date for the Colorado Springs directory.

The plaintiffs also allege that Qwest CEO Joe Nacchio directed that the terms of several other directories be altered, again permitting Qwest to recognize an additional month of revenue from these directories. These manipulations, the plaintiffs claim, also permitted Qwest to recognize additional revenue growth for its Directory Services division. Qwest recognized 42 million dollars in revenue in 2001 based on these changes in directory publi-

cations dates. The plaintiffs claim that improperly recognized revenue from the manipulation of directory terms caused Qwest's quarterly financial reports to be materially inaccurate from the fourth quarter of 2000 through the third quarter of 2001. The plaintiffs allege that Qwest failed to disclose that the changes in directory publication dates had a substantial effect on Qwest's recognized revenue figures.

The plaintiffs further allege that Qwest materially altered its financial statements by delaying depreciation of various assets, by overstating and improperly recognizing revenue on various transactions, and by improperly accounting for costs of doing business. For example, the plaintiffs allege that Qwest materially misstated its financial position when it failed to properly write down the value of its holdings in an entity known as KPNQwest. In essence, the plaintiffs allege that Qwest refused to account for a steep decline in the value of KPNQwest in Qwest's financial reports. In addition, the plaintiffs allege that Qwest materially enhanced its earnings statement for the first quarter of 2001 by changing the discount rate used to calculate its pension obligations. *Complaint,* ¶ 203(a). This change was not revealed, according to the plaintiffs, but the change increased Qwest's reported earnings by three cents per share. *Id.*

According to the plaintiffs, all of the accounting manipulations described in the Complaint, by themselves and in combination with each other, caused Qwest to materially misrepresent its financial position in its quarterly and annual statements throughout the class period. These representations were made in filings with the SEC, in press releases, and in quarterly and annual financial reports outlining the financial status of Qwest.

In July and August of 2002, Qwest announced that it would restate some of its past financial results. *Qwest's Motion to Dismiss,* p. 8. In particular, Qwest noted that it had applied its accounting policies incorrectly with respect to some IRU contracts and equipment sales. *Id.* Qwest does not claim that the plaintiffs have failed to plead falsity as to transactions which are the subject of any restatement of Qwest's financial results. *Id.*

The plaintiffs allege that the alleged accounting manipulations violated Generally Accepted Accounting Principles (GAAP). GAAP is a widely recognized set of accounting principles, standards and procedures. However, GAAP is not "a canonical set of rules that will ensure identical accounting treatment of identical transactions by all accountants." *Thor Power Tool Co. v. C.I. R.,* 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). Rather, GAAP generally tolerates a range of reasonable treatments, leaving the choice among reasonable treatments to management. *Id.*

Based on the factual allegations in the Complaint, the plaintiffs assert the following claims:

1) A claim against all of the defendants under Section 10(b) of the Securities Exchange Act of 1934 (the 1934 Act), 15 U.S.C. § 78j(b), and Rule 10(b)(5) of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5;

2) A claim under Section 20A of the 1934 Act, 15 U.S.C. § 78t(a), against Qwest and defendants Nacchio, Woodruff, and Szeliga;

3) A claim under under Section 20(a) of the 1934 Act against all of the individual defendants;

4) A claim under Section 11 of the Securities Act of 1933 (the 1933 Act), 15 U.S.C. § 77k, against Qwest, Arthur Andersen, LLP, and individual defendants Nacchio, Anschutz, Woodruff, Szeliga, Slater, and Tempest; and

5) A claim under Section 15 of the 1933 Act, 15 U.S.C. § 77o, against individual defendants Nacchio, Anschutz, Woodruff, and Szeliga.

The plaintiffs have postured their complaint as a class action on behalf of all Qwest shareholders who purchased or otherwise acquired the publicly traded securities of Qwest between May 24, 1999, and February 14, 2002 (the class period). A class has not been certified.

In their motions to dismiss, the defendants argue that the plaintiffs' complaint must be dismissed because the plaintiffs' factual allegations are not sufficient to support the claims asserted. For the purpose of ruling on a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the complaint is construed in the light most favorable to plaintiffs, and its allegations are taken as true. *See, e.g., Daigle v. Shell Oil Co.,* 972 F.2d 1527, 1533 (10th Cir.1992). In appraising the sufficiency of plaintiff's allegations, "the complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As discussed below, the defendants argue that the plaintiffs' allegations do not satisfy the particular pleading requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), as stated in 15 U.S.C. § 78u–4(b)(1) and (2).

## I. § 10(b) & THE PSLRA— GENERALLY

Section 10(b) makes it unlawful for any person to employ any manipulative or deceptive device, in contravention of the rules and regulations of the Securities and Exchange Commission (SEC), in connection with the purchase or sale of a securi-

ty. 15 U.S.C. § 78j(b). SEC rule 10(b)(5) provides that it is unlawful for a person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. To state a claim under § 10(b) and rule 10b–5, a plaintiff must allege that the defendant: a) made an untrue statement of material fact or failed to state a material fact; b) in connection with the purchase or sale of a security; c) with scienter; and d) the plaintiff relied on the misrepresentation and sustained damages as a proximate result of the misrepresentation. *See, e.g., Anixter v. Home–Stake Production,* 77 F.3d 1215, 1225 (10th Cir.1996).

 The level of scienter required to support a § 10(b) claim is intent to deceive, manipulate, or defraud. *City of Philadelphia v. Fleming Companies, Inc.,* 264 F.3d 1245, 1259 (10th Cir.2001). Proof of recklessness is sufficient to establish a § 10(b) claim. In this context, a defendant acts recklessly when his or her conduct amounts to an extreme departure from the standards of ordinary care, and presents a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of the danger. *Id.* at 1260. In the context of a claim based on non-disclosure of material facts, a plaintiff must show that the defendant 1) knew of the material fact; and 2) knew that failure to reveal the fact likely would mislead investors. *Fleming,* 264 F.3d at 1261. In essence, § 10(b) imposes liability for fraudulent statements made in connection with the purchase or sale of securities.

The plaintiffs allege that the defendants engaged in a broad scheme to materially overstate Qwest's profitability, and to otherwise factitiously enhance Qwest's balance sheet. According to the plaintiffs,

the defendants arranged for Qwest to improperly recognize large amounts of revenue on various transactions, to improperly account for costs on various transactions, and otherwise to cause Qwest's accounting to substantially deviate from accepted standards. In their Complaint and in their response to the motions to dismiss of Qwest and the individual defendants, the plaintiffs outline the 18 alleged accounting manipulations on which they rely to support their § 10(b) claim. These 18 accounting manipulations allegedly underlay numerous false statements of Qwest's financial position during the class period.

A section 10(b) claim is a type of fraud claim. Under FED. R. CIV. P. 9(b), a plaintiff must plead with particularity the facts supporting a fraud claim. In addition, the PSLRA imposes specific pleading requirements on complaints alleging securities fraud under § 10(b).

(1) Misleading statements and omissions In any private action arising under this chapter in which the plaintiff alleges that the defendant-

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular

state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1) and (2). Generally, the PSLRA is seen as imposing a standard of pleading which is more strict than that of Rule 9(b). *Fleming,* 264 F.3d at 1258.

■ In sum, the PSLRA requires the plaintiffs 1) to specify each statement alleged to have been misleading, and the reason or reasons the statement is misleading; and 2) with regard to each act or omission alleged to violate § 10(b), to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind, i.e. scienter. *See, e.g., Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1186 (10th Cir.2003). Courts must look to the totality of the pleadings to determine whether the plaintiffs' allegations support a strong inference of fraudulent intent, or scienter, as required by the PSLRA. *Fleming,* 264 F.3d at 1262. In this context, a strong inference of scienter is "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Adams v. Kinder–Morgan, Inc.,* 340 F.3d 1083, 1105 (10th Cir.2003). I have considered the totality of the plaintiffs' allegations in determining whether those allegations meet the requirements of the PSLRA.

■ When considering the adequacy of an inference of scienter under the PSLRA, a court must consider negative inferences which may be drawn against the plaintiff. *Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1187—88 (10th Cir.2003). In other words, a court must evaluate a plaintiff's suggested inference in the context of other reasonable inferences that may be drawn from the facts alleged. *Id.* The inference of scienter suggested by the plaintiff must be strong in light of the overall context of the allegations, including reasonable inferences against the plaintiff's position. *Id.*

I note that the plaintiffs make some factual claims in their responses to the motions to dismiss which are not included in the allegations of the Complaint. In evaluating the sufficiency of the plaintiffs' allegations, I have evaluated only the allegations in the Complaint. I have disregarded the additional factual claims asserted by the plaintiffs in their responses to the motions to dismiss.

## II. § 10(b) CLAIM—QWEST

In their Complaint the plaintiffs allege that the defendants engaged in 18 different accounting manipulations in an effort to artificially inflate the price of Qwest stock. These manipulations, the plaintiffs claim, caused Qwest to 1) overstate its revenues; 2) understate its costs; 3) manipulate the Qwest retirement plan to enhance Qwest's financial statements; and 4) account improperly for Qwest's assets and liabilities. The plaintiffs further allege that these manipulations were not disclosed by the defendants. In paragraphs 133 through 254 of the Complaint, the plaintiffs describe various statements made by the defendants, and the reasons the plaintiffs claim these statements were false and misleading. Again, these statements generally concern Qwest's quarterly and annual statements of its financial position throughout the class period. The statements were made in filings with the SEC, in press releases, and in quarterly and annual financial reports outlining the financial status of Qwest. The plaintiffs claim that the 18 alleged accounting manipulations underlay the alleged false and misleading statements.

In its motion to dismiss, Qwest argues that the plaintiffs have not alleged facts

showing that Qwest intentionally or recklessly made false or misleading statements based on the improper accounting practices alleged in the Complaint. In general, Qwest argues that the plaintiffs' allegations concerning each of the alleged improper accounting practices do not support a strong inference that Qwest engaged in these accounting practices with fraudulent intent to deceive investors. In other words, Qwest argues that the plaintiffs have not alleged facts sufficient to show that Qwest's accounting decisions were taken with fraudulent intent to deceive investors.

### A. Inadequately Pled Accounting Manipulations

I conclude that the plaintiffs' allegations concerning six of the alleged accounting manipulations undertaken by the defendants are too general to satisfy the pleading requirements of the PSLRA. The plaintiffs' allegations concerning these accounting issues are so general that it cannot reasonably be inferred that the alleged accounting manipulation was an extreme departure from the standard of ordinary care, or that the practice presented a danger of misleading buyers or sellers which was known to Qwest. Absent some indication that a particular manipulation was the basis for a material misstatement, I cannot conclude that these allegations are sufficiently specific to support a strong inference of scienter as to Qwest; a strong inference that Qwest knew the fact was material, and knew that failure to reveal the fact likely would mislead investors.

#### 1. Warwick Valley

■ The plaintiffs allege that Qwest signed a five year, 15 million dollar contract with Warwick Valley Telephone Company in June, 1999. The plaintiffs allege that Qwest "recognized all of the potential revenue under the contract in the period in which it was signed, instead of over the life of the contract, violating GAAP..." *Complaint,* ¶ 67. As Qwest notes, the plaintiffs do not describe what services were involved in the contract, why it was improper to recognize the revenue from the contract in June, 1999, or what accounting principles were violated. These allegations are not sufficiently specific to indicate why later statements related to this transaction were materially misleading. Further, these allegations are too general to support a strong inference that Qwest knew that failure to reveal the basis for its recognition of this revenue was likely to mislead investors. The plaintiffs' allegations concerning the Warwick Valley Telephone Company Contract are not sufficiently specific to satisfy the standards of the PSLRA.

#### 2. Pro Forma Results

■ The plaintiffs allege that Qwest issued a misleading press release in April, 2001. In that release, Qwest emphasized "pro forma" profits of $218 million in the first quarter of 2001. *Complaint,* ¶ 82. In an attachment to the release, Qwest disclosed that it had lost 46 million dollars in the first quarter of 2001 under GAAP. *Id.* The text of the release includes a statement which summarizes the type of accounting items which were excluded from the pro forma results. *Supplemental Declaration of Terrence Gill,* Ex. 60. Although the release itself is not part of the Complaint, I properly may consider the content of the release in resolving the motion to dismiss. *See, e.g., Prager v. La-Faver,* 180 F.3d 1185, 1188—89 (10th Cir. 1999) (in resolving 12(b)(6) motion court may consider indisputably authentic copy of document referred to in complaint and central to plaintiff's claim).

Considering the limitations clearly expressed in the release, and the disclosure of a loss under GAAP, I conclude that the

plaintiffs' allegations concerning this statement of pro forma results do not support a strong inference that Qwest knew this statement was likely to mislead investors. Although the release attempts to paint a pretty picture, it also discloses the substantial limitations on the accounting reflected in the release. Further, the release discloses Qwest's financial results as calculated under GAAP. With these disclosures, this press release does not support a strong inference that Qwest knew that presentation of its financial information in this manner was likely to mislead investors.

### 3. Number of Wireless Customers

█ The plaintiffs allege that Qwest inflated the reported number of its wireless customers during the class period. *Complaint*, ¶ ¶ 83—85. According to the plaintiffs, when a wireless customer would ask to have service disconnected, Qwest often would provide the customer with free service, including 30 free minutes per month. The plaintiffs claim that many of these so-called "disconnect 30s" were maintained as Qwest wireless customers even though the customers had asked to have their service disconnected. The plaintiffs allege that thousands of disconnect 30s were included in Qwest's stated number of wireless subscribers during the class period. As alleged by the plaintiffs, the total number of wireless subscribers reported by Qwest ranged from 691,000 to one million during the class period. *Complaint*, ¶ 83.

The plaintiffs allegations concerning the alleged inflation of the number of wireless subscribers are far to general to satisfy the requirements of the PSLRA. The plaintiffs give no indication as to how many of Qwest's claimed number of subscribers were disconnect 30s, nor do the plaintiffs give any indication of how the practice of counting disconnect 30s affected Qwest's revenue figures. These allegations are not sufficiently specific to indicate why Qwest's later statements related to wireless subscriber numbers were materially misleading. Further, these allegations are too general to support a strong inference that Qwest knew that failure to reveal the counting of disconnect 30s as subscribers was likely to mislead investors.

### 4. VDSL Project

█ In the fourth quarter of 2000, Qwest abandoned plans to build a very high bandwidth digital subscriber line (VDSL) service in Arizona and Colorado. The plaintiffs allege that many of the costs incurred on the project were incurred after the merger with U.S. West. According to the plaintiffs, Qwest acted improperly when it wrote off costs associated with the project as costs associated with the merger, and not as part of Qwest's operating expenses. *Complaint*, ¶ 88. The plaintiffs do not allege the amount of these costs, or how this accounting led to material misstatements of Qwest's financial position. These allegations are not sufficiently specific to indicate why Qwest's later statements related to the abandoned VDSL project were materially misleading. Further, these allegations are too general to support a strong inference that Qwest knew that failure to reveal how it accounted for costs related to the VDSL project was likely to mislead investors.

### 5. Revenue from Cramming and Slamming

█ The plaintiffs allege that Qwest improperly recognized revenue from cramming, packaging extra but unwanted services to customers, and slamming, switching long distance services without authorization. The plaintiffs allege that various penalties were imposed on Qwest for these practices. *Complaint*, ¶ 90—93. However, the plaintiffs give no indication as to how much revenue allegedly was

recognized based on these practices. It is noteworthy that the plaintiffs do not address this issue in their response to Qwest's motion to dismiss.

Absent some indication of the magnitude of the alleged overstatement of revenue based on cramming and slamming, these allegations are insufficient. These allegations are not sufficiently specific to indicate why Qwest's later statements concerning its revenue were materially misleading, based on recognized revenue from cramming and slamming. Further, these allegations are too general to support a strong inference that Qwest knew that failure to reveal this alleged source of recognized revenue was likely to mislead investors.

### 6. Payment of Severance Benefits

■ The plaintiffs allege that Qwest management inflated Qwest's earnings by deducting severance payments owed to departing executives from the Qwest pension plan rather than from Qwest's operating earnings. *Complaint,* ¶ 89. The plaintiffs claim this was done to increase reported earnings but without disclosing the change to the public. The plaintiffs give no indication of the amount of money involved in these transactions, or the extent to which this accounting change affected Qwest's stated operating earnings. These allegations are not sufficiently specific to indicate why Qwest's later statements concerning its revenue were materially misleading because severance payments were not deducted from operating earnings. Further, these allegations are too general to support a strong inference that Qwest knew that failure to reveal the accounting for severance payments was likely to mislead investors.

### B. Adequately Pled Accounting Manipulations

■ As discussed above, when the plaintiffs allege that an accounting manipulation was the basis for materially false statements made by the defendants, the plaintiffs must outline in some detail how the alleged manipulations formed the basis for materially false statements. I find that the plaintiffs have provided sufficient detail in their Complaint with regard to the 12 alleged accounting manipulations not listed in Section II–A, above. These manipulations are described with enough detail that their materiality, and the way in which these manipulations underlay the inaccurate statements alleged by the plaintiffs, is sufficiently clear. With regard to these alleged manipulations, the effect of each manipulation on Qwest's finances is stated with some detail, or reasonably can be inferred from the facts alleged.

As to the plaintiffs' claims that Qwest improperly recognized revenue on various transactions, I find that the plaintiffs allegations are sufficiently specific concerning: 1) the so-called IRU transactions; 2) the KMC transactions; 3) the manipulation of directory revenues; 4) manipulation of consumer and small business services revenues; and 5) recognition of revenue on the Genuity contract. The plaintiffs also allege that Qwest inflated its balance sheet during the class period by improperly accounting for various costs, the value of various assets, the effect of a one time pension credit, and the effect of a change in performance assumptions for its pension plan. On this front, I find that the plaintiffs have made sufficiently specific allegations concerning 1) the suspension of recording of depreciation expenses on certain access lines; 2) capitalization of software development and interest costs; 3) accounting for selling, general, and administrative (S,G & A) expenses; 4) accounting for the value of Qwest's interest in KPNQwest; 5) accounting for losses on property, plant, and equipment; and 6) Qwest's failure to disclose the effect of a one time pension credit of $299 million in

2000; and 7) Qwest's failure to disclose the effect of a change in assumptions about the performance of its pension plan. With regard to each of these issues, I find that the plaintiffs' allegations are sufficient to demonstrate the materiality of the accounting practice in question, and the way in which the particular accounting scheme was the basis for the material misstatements alleged in the Complaint. Therefore, as to the alleged accounting manipulations listed above, the Complaint satisfies the requirements of the PSLRA.

## C. Conclusion

The plaintiffs allegations concerning the six alleged accounting manipulations described in Section II–A, above, are not sufficiently pled to indicate why Qwest's later statements concerning these specific issues were materially misleading. Further, these allegations are too general to support a strong inference that Qwest knew that failure to reveal the facts related to these issues was likely to mislead investors. These allegations do not satisfy the requirements of the PSLRA, and the plaintiffs' section 10(b) claim based on these allegations must be dismissed as to Qwest. On the other hand, the plaintiffs allegations concerning the 12 alleged accounting manipulations listed in Section II–B, above, are sufficiently specific. The plaintiffs' allegations in support of their section 10(b) claim based on these 12 alleged manipulations satisfy the pleading requirements of the PSLRA.

## III. § 10(b) CLAIM—INDIVIDUAL DEFENDANTS

The individual defendants are or were directors, officers, and executives of Qwest. The individual defendants argue that the plaintiffs have not satisfied the standard for pleading scienter under the PSLRA. The individual defendants argue that the plaintiffs have not pled facts which would support a strong inference that each individual defendant intentional-ly or recklessly made false or misleading statements. Specifically, the individual defendants argue that the plaintiffs have not made specific allegations indicating that each of the individual defendants 1) knew of the material facts which underlay the alleged fraudulent statements; and 2) made a statement which was untrue or which failed to reveal material facts. In addition, the individual defendants argue that the plaintiffs' allegations concerning the individual defendants' sales of Qwest stock do not support a strong inference of scienter under the PSLRA's pleading standards.

### A. Inadequately Pled Accounting Manipulations

■ For the reasons discussed in Section II–B–1, above, I conclude that the plaintiffs allegations based on six of the alleged accounting manipulations are not sufficient to support a strong inference of scienter under the PSLRA. This conclusion applies equally to each of the individual defendants. Thus, I conclude that the plaintiffs' section 10(b) claim must be dismissed as to the individual defendants with regard to claims based on alleged improper accounting concerning: 1) the Warwick Valley Telephone Company transaction; 2) Qwest's statement of pro forma results in April, 2001; 3) Qwest's reporting of the number of wireless customers subscribing to its services; 4) Qwest's accounting for costs of the VDSL project; 5) recognition of revenues from cramming and slamming; and 6) Qwest's payment of severance benefits from its pension plan. The plaintiffs' allegations concerning these accounting issues are not sufficiently specific to support a strong inference of scienter as to the individual defendants—that is, a strong inference that the individual defendants knew the fact was material, and knew that failure to reveal the fact likely would mislead investors.

## B. Remaining Accounting Manipulations

As discussed in II–B–2, above, I find that the plaintiffs have alleged sufficient facts concerning the 12 other alleged accounting manipulations. I find that the plaintiffs have satisfied the pleading standard of the PSLRA as to defendants Nacchio, Anschutz, Szeliga, Woodruff, Tempest, and Slater concerning each of the 12 remaining accounting manipulations and the related misrepresentations alleged in the Complaint. I further find that the plaintiffs have satisfied the requirements of the PSLRA concerning defendant Smith, but only as to the alleged misrepresentations concerning directory revenues and improper recognition of revenue based on overstatement of orders for internet services (the so-called "flash" sales). *Complaint,* ¶ 80—81. On the other hand, I find that the plaintiffs have not satisfied the pleading standard of the PSLRA concerning defendants Jacobsen, Weisberg, and Wilks. The bases of these conclusions are outlined below.

Again, when evaluating the sufficiency of a complaint under the PSLRA, a court must consider the totality of the plaintiffs' reticulated allegations to determine whether those allegations support a strong inference of scienter. In this case, four factors are of primary importance in making this evaluation as to the individual defendants: 1) whether the individual defendants made untrue statements of material fact, or omitted to state material facts; 2) whether the individual defendants knew of the relevant material facts; 3) whether the individual defendants allegedly engaged in a series of large-scale accounting manipulations and related misstatements over a period of more than 30 months; and 4) the nature of the individual defendants' trading in Qwest stock during the class period.

### 1. Statements by Individual Defendants

The individual defendants note that the plaintiffs do not allege that individual defendants Anschutz, Jacobsen, Tempest, Slater, Smith, Weisberg, or Wilks made any public statements relating to Qwest's financial results. Absent an allegation that an individual made a public statement, the defendants argue, that individual cannot be subject to liability under § 10(b). The plaintiffs contend that the individual defendants who did not themselves make statements are subject to § 10(b) liability under the doctrine of group publication.

 "Identifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers." *Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1254 (10th Cir.1997). Prospectuses, registration statements, annual reports, press releases, and similar statements are subject to a presumption of collective action. *Id.* The false statements alleged in the Complaint all were made in registration statements, prospectuses, SEC forms, or in statements to the press concerning Qwest's financial performance. All of these statements are subject to a presumption of collective action by corporate directors and officers under the group publication doctrine.

The individual defendants argue that the group publication doctrine was rendered invalid by the PSLRA. *Schwartz* concerned facts which were not subject to the pleading requirements of the PSLRA. As the individual defendants note, some courts have concluded that the group publication doctrine was rendered invalid by the PSLRA. *Individual defendants' reply,* filed October 31, 2002, pp. 7—8. I conclude that the group publication doc-

trine was not abrogated by the PSLRA. In *Schaffer v. Evolving Systems, Inc.,* the court concluded that the group publication doctrine was not vitiated by the PSLRA. 29 F.Supp.2d 1213, 1225 (D.Colo.1998); *see also In re American Bank Note Holographics Inc. Securities Litigation,* 93 F.Supp.2d 424, 442 (S.D.N.Y.2000). I find the position taken by Judge Brimmer in *Schaffer* to be persuasive, even in light of the Tenth Circuit's later holdings concerning the requirements of the PSLRA, as stated in *Fleming.* In short, the plaintiffs have sufficiently alleged that the individual defendants made statements which form the basis of the plaintiffs' § 10(b) claims.

### 2. Scope and Magnitude of Improper Accounting & Misrepresentations

■ Allegations of pervasive and long-standing accounting machinations, and resulting misstatements, may support a strong inference of scienter under the PSLRA. *See, e.g., Adams v. Kinder–Morgan, Inc.,* 340 F.3d 1083, 1106 (10th Cir. 2003); *In re MicroStrategy, Inc. Securities Litigation,* 115 F.Supp.2d 620, 635 (E.D.Va.2000) (number, size, timing, nature, frequency, and context of accounting manipulations, combined with other circumstances, can provide support for strong inference of scienter); *In re Raytheon Securities Litigation,* 157 F.Supp.2d 131, 147—48 (D.Mass.2001) (magnitude of accounting overstatements, combined with other circumstances, can support strong inference of scienter).

In their Complaint, the plaintiffs allege a sustained pattern of repeated manipulations and misrepresentations over a period of more than 2½ years. They allege manipulations and misrepresentations of a substantial magnitude amounting to many hundreds of millions of dollars. As alleged, these manipulations and misrepresentations materially affected Qwest's public financial reporting throughout the class period. This is so even when the six inad-

equately pled accounting manipulations, detailed above, are excluded from consideration. The scope and magnitude of the surviving accounting manipulations and misrepresentations alleged by the plaintiffs support a strong inference of scienter.

### 3. Insider Trading Allegations

Prior to the PSLRA, some circuit courts of appeals held that scienter could be alleged in a securities fraud case by showing the defendant's motive and opportunity to commit securities fraud. *Fleming,* 264 F.3d at 1261. To establish scienter by pleading motive and opportunity, the plaintiff had to allege that the defendant benefited from the alleged fraud in some concrete and personal way, "as when the defendants made material misrepresentations to maintain a high stock price and then sold their own shares at a profit." *Id.,citing Novak v. Kasaks,* 216 F.3d 300, 307—08 (2nd Cir.2000).

■ In *Fleming,* the court held that motive and opportunity pleading, standing alone, is not sufficient to allege scienter under the PSLRA. 264 F.3d at 1263. However, the *Fleming* court also held that allegations concerning a defendant's motive and opportunity to commit securities fraud may be considered in determining whether the "plaintiffs' allegations, taken as a whole, give rise to a strong inference of scienter." *Fleming,* 264 F.3d at 1263. The First Circuit has said: "Stock sales by insiders can supply evidence of scienter (under the PSLRA). The vitality of the inference to be drawn depends on the facts, and can range from marginal to strong.'" *In re Cabletron Systems, Inc.,* 311 F.3d 11, 40 (1st Cir.2002) (quoting *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 197–98 (1st Cir.1999)).

■ The plaintiffs in this case allege that each individual defendant "took advantage of the temporary inflation in

Qwest's stock price caused by their false statements" when they sold substantial amounts of their Qwest stock during the class period. *Complaint*, ¶¶ 43—44, 255—256. The stock sales of the individual defendants are outlined in the Complaint at paragraphs 255 to 258. Excluding defendant Szeliga, each defendant allegedly realized proceeds from these sales ranging from about $11.5 million for defendant Smith, to about $213 million for defendant Nacchio, to a high of over $1.5 billion for Anschutz. According to the defendants, Nacchio and Smith disposed of about 33 percent of their holdings during the class period. *Individual defendants' motion to dismiss*, p. 9. Anschutz sold about 11 percent of his Qwest holdings during this period. *Id.* The individual defendants represent that other defendants, again excluding Szeliga, disposed of between 62 percent and 83 percent of their Qwest holdings during the class period. *Id.* The plaintiffs allege that these sales represented an even higher percentage of these defendants' Qwest holdings, ranging from 49 percent for Nacchio and Smith, to 98 percent for Wilks. *Complaint*, ¶ 43.

The plaintiffs allege that Szeliga sold 10,000 shares of Qwest Stock on April 30, 2001, at a price of $41 per share, receiving gross proceeds of $410,000. According to the plaintiffs, these shares constituted seven percent of Szeliga's Qwest holdings. In their motion to dismiss, the individual defendants indicate that this sale represented 1.89 percent of Szeliga's Qwest stock. *Id.* Prior to becoming CFO (Chief Financial Officer) on April 18, 2001, Szeliga was not required to disclose her sales of Qwest stock. Szeliga's one sale of stock is much smaller than the sales of the other individual defendants, both in terms of the gross proceeds she received and the percentage of her Qwest holdings she sold.

Courts should not infer fraudulent intent based only on the fact that some officers

sold stock. Rather, plaintiffs must allege that the trades were made at times and in quantities that are suspicious enough to support the necessary strong inference of scienter. *In re MicroStrategy, Inc. Securities Litigation*, 115 F.Supp.2d 620, 643 – 644 (E.D.Va.2000) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir.1997) (pre-PSLRA)).

> Among the factors relevant to this inquiry are (i) whether the alleged trades were "normal and routine" for the insider; (ii) whether profits reaped "were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud"; and, (iii) whether, in light of the insider's total stock holdings, the sales are unusual or suspicious.

*Id.* Considering all of the allegations in the Complaint, I conclude that the stock sales of each individual defendant properly can be considered in determining whether the plaintiffs' allegations, as a whole, support a strong inference of scienter.

Even by the defendants' estimation, each of the individual defendants, except Szeliga and Anschutz, sold 33 percent or more of their Qwest stock between May, 1999, and May, 2001. It is difficult to characterize sales of such substantial proportions of a corporate official's holdings as simply normal and routine. If sales at this rate were normal and had continued, the individual defendants would have completely divested themselves of Qwest stock in short order. The fact that sales by the individual defendants ceased completely after May 31, 2001, also tends to indicate that the sales in question were unusual, and not the norm.

In addition, it must be noted that these sales generated tens of millions of dollars in proceeds for most of the individual de-

fendants. Nacchio and Anschutz generated even larger amounts. Nacchio generated proceeds of over $200 million and Anschutz generated over $1.5 billion. Of course, proceeds are not equal to profits. The plaintiffs indicate that some or all of the defendants had options to buy Qwest stock which made the defendants' sales of this stock quite profitable. *Complaint,* ¶ 257. However, the plaintiffs do not provide any detail indicating precisely how profitable these trades were for the individual defendants. In light of the range of prices at which Qwest stock traded during the class period, it is apparent that the stock sales of the individual defendants likely were, at minimum, significantly profitable for them. Even if the defendants' profits were relatively small, the sale of a substantial portion of the defendants' holdings while the stock price was artificially inflated would, at minimum, permit that defendant to maximize profits; to maximize the benefit of the alleged deception.

Further, it is notable that each of the individual defendants, excluding Szeliga and Anschutz, sold significant amounts of Qwest stock when its price was nearing its zenith. These sales took place between early May and early November, 2000, when Qwest stock traded at 45 dollars per share and above, the highest per share prices achieved during the class period. Obviously, these trades presented the greatest opportunity for profit and the greatest opportunity to benefit from the alleged deception.

All of the stock sales alleged in the Complaint took place between May 24, 1999, the beginning of the class period, and May 31, 2001. The class period ends on February 14, 2002. The defendants argue that the defendants had no motive to mislead the market after May 31, 2001, if no stock sales took place after that date. The defendants appear to argue that, at minimum, the allegations of the Complaint are not sufficient to establish scienter beyond May 31, 2001. Considering all of the circumstances alleged in this case, the fact that the individual defendants stopped selling stock on May 31, 2001, does not preclude a strong inference of scienter beyond that date. *See, e.g., Stevelman v. Alias Research Inc.,* 174 F.3d 79, 85—86 (2nd Cir.1999) (material misstatements made after stock sales, which followed earlier misstatements, could be probative of intent to keep stock price high to avoid detection of alleged fraud).

In the context of the facts alleged in the Complaint, defendant Szeliga's one sale on April 30, 2001, appears unusual. It appears that Szeliga generally was not selling her shares, but then opted to sell seven percent of her holdings on one day. Szeliga's proceeds of $410,000 are small, compared to the other defendants' proceeds. Still, $410,000 is a substantial sum, and reasonably can be seen as a significant gain from the alleged deception. In view of these facts, I conclude that the vitality of the inference which reasonably can be drawn from Szeliga's one stock sale is fairly weak, but not inconsequential. However, as part of the totality of allegations concerning Szeliga, Szeliga's stock sale does provide some support for a strong inference of scienter.

As to the other individual defendants, I find that the alleged stock sales by these individuals provide significant support for a strong inference of scienter. The fact that these defendants sold a large proportion of their Qwest holdings, that the proceeds generated were substantial, and that a significant portion of the sales by these defendants took place while Qwest's stock was trading at particularly high prices, all support the plaintiffs' claim that these defendants acted with scienter.

#### 4. Individual Defendants' Knowledge of Material Facts

As to each of the individual defendants, the plaintiffs allege that

> (b)ecause of their positions and access to material non-public information, each of [the individual] defendants knew that the adverse facts specified [in the Complaint] had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

*Complaint,* ¶ 35. In addition to this general allegation of knowledge, the plaintiffs allege facts indicating that certain of the individual defendants had knowledge of material facts related to some of the 18 accounting manipulations alleged in the Complaint. The defendants argue that a claim that an individual defendant knew of relevant, material facts based solely on the fact that the defendant held a high position in corporate management is not sufficient to support a strong inference of scienter under the PSLRA's pleading standards. ██ In *Fleming,* the Tenth Circuit found that allegations that a securities fraud defendant must have known of certain information because of his position in the company, without more, are not sufficient to support a strong inference of scienter under the PSLRA. *Fleming,* 264 F.3d at 1263—64 (allegations that defendants held senior management positions, had access to inside information, and thus must have known of fraudulent statements insufficient to plead scienter under PSLRA). However, an allegation that an individual defendant knew certain information based on that individual's position in a company, combined with other relevant allegations concerning knowledge or motive, can be sufficient to support a strong inference of scienter under the PSLRA. *Adams v. Kinder–Morgan, Inc.,* 340 F.3d 1083, 1105—06 (10th Cir.2003); *In re*

*Sprint Corporation Securities Litigation,* 232 F.Supp.2d 1193, 1224 (D.Kan.2002). ██ In *Adams,* the plaintiffs alleged that defendant Hall was the CEO of the defendant corporation, that the chief financial officer had knowledge of the improper revenue recognition practice in question, and that the revenue recognition practice had a substantial effect on reported net income. The Tenth Circuit found that these allegations were sufficient to support a strong inference that Hall knew of the practice and acted with scienter. *Adams,* 340 F.3d at 1106. In *Sprint,* the plaintiffs alleged that the individual defendants were directors and officers of Sprint. *Sprint,* 232 F.Supp.2d at 1223. The plaintiffs alleged that the defendants held positions of control and had access to material, non-public information. *Id.* at 1225. The court found that allegations of knowledge based on the individual defendants' positions as corporate directors and officers, combined with compelling allegations of motive, based on the potential value of stock options held by the same individuals, were sufficient to raise a strong inference of scienter as to each individual defendant. *Id.* at 1224—25.

In the present case, the plaintiffs have alleged knowledge of specific accounting issues on the part of some of the individual defendants. However, with regard to many of the defendants and many of the alleged fraudulent statements, the plaintiffs' allege that the defendants knew of the relevant material facts, and of the falsity of the allegedly fraudulent statements, because the defendants held specific, high positions in Qwest's management structure and had access to material, non-public information. Under *Fleming,* these allegations alone are not sufficient to satisfy the pleading requirements of the PSLRA. However, as in *Adams* and *Sprint,* the plaintiffs also provide other allegations

which support a strong inference of scienter, including detailed and compelling allegations of motive on the part of the individual defendants. These allegations of motive concern each individual defendant's stock sales during the class period. As discussed in Section III–B–3, above, the plaintiffs' allegations concerning the individual defendants' stock sales provide substantial support for a strong inference of fraudulent intent under the PSLRA, except as to defendant Szeliga.

Further the plaintiffs have described in detail the various accounting manipulations allegedly undertaken by the defendants. In essence, the plaintiffs have alleged a series of large-scale accounting manipulations and related material misstatements over a period of more than 30 months. As discussed in Section III–B–2, above, the magnitude and pervasiveness of the manipulations and misstatements alleged also supports a strong inference of fraudulent intent under the PSLRA.

### 5. Conclusion

Considering all of the plaintiffs' allegations and the foregoing factors, I must determine whether the plaintiffs' allegations support a strong inference of scienter. Again, a strong inference of scienter is "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Adams v. Kinder–Morgan, Inc.,* 340 F.3d 1083, 1105 (10th Cir.2003). Having undertaken this analysis, I reach the following conclusions.

***a. Nacchio, Anschutz, Szeliga, Woodruff, Tempest, and Slater***—I find and conclude that the plaintiffs' allegations support a strong inference of scienter as to defendants Nacchio, Anschutz, Szeliga, Woodruff,Tempest, and Slater concerning each of the 12 remaining alleged accounting manipulations and the related misrep-

resentations. These five defendants held positions at the pinnacle of the Qwest management structure. Nacchio and Szeliga made frequent statements about the details of Qwest's finances. All five of these defendants were in positions where the overall picture of Qwest's finances routinely was examined and evaluated. These defendants held these positions during a time when financial manipulations and misrepresentations of a very broad scope and magnitude allegedly were undertaken. With the exception of Szeliga, each of these defendants generated millions of dollars in proceeds from the sale of Qwest stock during a time when the price of that stock was, according to the plaintiffs, artificially inflated due to the financial manipulations and misrepresentations. Under the PSLRA, these alleged facts are sufficient to support a strong inference of scienter as to defendants Nacchio, Anschutz, Woodruff, Tempest and Slater.

■ As discussed above, Szeliga's single stock sale provides fairly weak, but not inconsequential, support for a strong inference of scienter. I note that Szeliga was at the top of Qwest's accounting operation throughout the class period. She was Senior Vice President of Finance until April 18, 2001, and then was CFO from April 18, 2001 until the end of the class period. She was in a particularly good position to understand the alleged manipulations and misrepresentations. This fact, combined with the scope and magnitude of the alleged manipulations and misrepresentations undertaken with Szeliga at or near Qwest's financial helm, provide very substantial support to an inference of scienter. These factors, combined with Szeliga's relatively small stock sale while Qwest stock was trading at a healthy price, are sufficient to support a strong inference of scienter in this case.

**b. Smith**—I find that the plaintiffs have satisfied the requirements of the PSLRA concerning defendant Smith, but only as to the alleged misrepresentations concerning directory services revenues and the improper recognition of revenue based on overstatement of customer orders for internet services (the so-called "flash" sales). *Complaint,* ¶ 80—81. Defendant Smith was the Executive Vice President of Small Business and Consumer Markets during the class period. It was Smith's division which allegedly benefited from the alleged manipulation of directory publications, and the alleged inflation of revenues from so-called "flash" sales. *Complaint,* ¶ ¶ 70—78, 80—81. The plaintiffs specifically allege that Smith was directly involved in the directory services manipulation. It is reasonable to infer that Smith also was aware of the inflation of revenues based on the overstatement of customer orders for internet services (the so-called "flash" sales) in his department.

The Complaint includes reasonably specific allegations which indicate that Smith was aware of the directory services manipulations and of the inflation of revenues on the so-called "flash" sales. These allegations concerning Smith's knowledge of the facts, combined with the scope and magnitude of these accounting manipulations, and Smith's substantial sales of Qwest stock during the class period, are sufficient to support a strong inference of scienter as to these two alleged accounting manipulations.

On the other hand, nothing in the Complaint indicates that Smith was aware of any of the other alleged accounting manipulations and misrepresentations. Based on Smith's position alone, it cannot simply be assumed that he was aware of all of the other alleged manipulations and misrepresentations, which apparently had no effect on Smith's Small Business and Consumer Markets division. As to these other ma-nipulations and misrepresentations, I find that the plaintiffs' allegations do not support a strong inference of scienter.

**c. Jacobsen, Weisberg, and Wilks**—I find and conclude that the plaintiffs have not satisfied the pleading standard of the PSLRA concerning defendants Jacobsen, Weisberg, and Wilks. Each of these defendants sold substantial amounts of Qwest stock during the class period, and each received substantial proceeds from these sales. These facts, along with the scope and magnitude of the alleged misrepresentations provide some support for an inference of scienter as to these defendants. I find and conclude, however, that the allegations in the Complaint are not sufficient to support an inference that these defendants were aware of the materiality and falsity of the alleged misrepresentations. Absent sufficient factual allegations on this issue, I find that the plaintiffs' Complaint does not support a strong inference of scienter as to defendants Jacobsen, Weisberg, and Wilks.

During the class period, Jacobsen was Executive Vice President, Global Business Markets. Weisberg was Executive Vice President, Corporate Development. Wilks was President, Internet and Multi–Media Markets until October, 2000. At that point, Wilks became Executive Vice President, Internet Business Development and Chief Strategy Officer. Unlike those who were CEOs, CFOs, and directors of Qwest, there is no indication that these defendants held positions which involved analysis of Qwest's full financial picture. Rather, they held positions which apparently had a discrete focus on a certain area. The plaintiffs' allegations do not indicate that any of the alleged accounting manipulations and misrepresentations were related to the departments headed by these three defendants. The plaintiffs' allega-

tions do not indicate that the positions held by these defendants required them to understand or monitor the type of information addressed by the alleged manipulations and misrepresentations.

The nature of the positions held by Jacobsen, Weisberg, and Wilks does not indicate that they were aware of the manipulations and misrepresentations alleged by the plaintiffs. Absent some more substantial basis to conclude that these defendants likely were aware of the alleged manipulations and misrepresentations, I cannot presume that they were aware. *Fleming*, 264 F.3d at 1263—64. Absent some indication of such awareness, I cannot conclude that the plaintiffs' allegations support a strong inference of scienter as to these defendants.

### C. Conclusion

The plaintiffs allegations concerning the six alleged accounting manipulations described in Section II–A, and III–A, above, do not satisfy the pleading requirements of the PSLRA. The plaintiff's claims based on these alleged manipulations must be dismissed.

For the reasons discussed in Section II–B, above, the plaintiffs' allegations support a strong inference of scienter as to defendants Nacchio, Anschutz, Szeliga, Woodruff, Tempest, and Slater concerning the remaining 12 alleged accounting manipulations and the related misrepresentations. The plaintiffs' allegations support a strong inference of scienter as to defendant Smith only with regard to the alleged misrepresentations concerning directory services revenues, and the improper recognition of revenue based on overstatement of customer orders for internet services (the so-called "flash" sales). Finally, the plaintiffs' allegations do not support a strong inference of scienter as to defendants Jacobsen, Weisberg, and Wilks, and the section 10(b) claims against these defendants must be dismissed.

### IV. § 20A CLAIM

 The plaintiffs assert a claim against all of the individual defendants under § 20A of the 1934 Act. 15 U.S.C. § 78t–1(a). A claim under § 20A is a claim against those who have violated any provision of the 1934 Act, or its rules and regulations, "by purchasing or selling a security while in possession of material, nonpublic information...." 15 U.S.C. § 78t–1(a). A § 20A claim must be predicated on a separate violation of the 1934 Act or its rules and regulations. *See, e.g., Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.,* 32 F.3d 697, 703 (2nd Cir.1994). Such claims often are referred to as insider trading claims.

The individual defendants argue that the plaintiffs' § 20A claim must be dismissed because the plaintiffs have not adequately pled a § 10(b) claim or a Rule 10b–5 claim. For the reasons discussed in Sections II and III of this order, I conclude that the plaintiffs have stated a claim under § 10(b) and Rule 10b–5 on a variety of bases. However, I also have concluded that some aspects of the plaintiffs' § 10(b) and Rule 10b–5 claim have not been pled with sufficient particularity. The plaintiffs' § 20A claim must rise and fall with their § 10(b) and Rule 10b–5 claim. To the extent the plaintiffs' § 20A claim is based on the six inadequately pled accounting machinations described in Section II–A, above, the § 20A claim must be dismissed. Further, the plaintiffs' § 20A claim must be dismissed as to defendants Jacobsen, Weisberg, and Wilks because the plaintiffs have not stated a § 10(b) claim as to these defendants. On the other hand, to the extent the plaintiffs' § 10(b) and Rule 10b–5 claim has been pled adequately, the dependent § 20A claim also survives.

The individual defendants also argue that the plaintiffs lack standing to assert a § 20A claim against the nine individual

defendants with whom no plaintiff is alleged to have traded contemporaneously. Under § 20A, any defendant who violated § 10(b) or related rules by purchasing or selling a security is liable to any person who traded securities "contemporaneously" with the defendant. 15 U.S.C. § 78–t 1(a). The precise scope of the term contemporaneously is not defined in § 20A. As noted by the parties, various courts have read this requirement to encompass trades on the same day, within the same week, within a month, and including "the entire period while relevant and nonpublic information remained undisclosed." *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 258 F.Supp.2d 576, 599 –600 (S.D.Tex.2003) (*quoting In re MicroStrategy*, 115 F.Supp.2d at 662–63 nn. 83–85). For the reasons discussed in *In re Enron*, I find that the term "contemporaneously" cannot reasonably be read to include the entire period during which relevant nonpublic information remained undisclosed. *Id.* at 600. For the purpose of resolving the motion to dismiss I need not determine precisely how narrow the period of contemporaneous trades is under § 20A.

The individual defendants argue that the plaintiffs have pleaded only one trade by one plaintiff which was contemporaneous with a trade by defendant Nacchio. The plaintiffs allege that "(p)laintiff Matthew B. Sellers purchased shares contemporaneously with Nacchio's stock sales on 5/7/01." *Complaint,* ¶ 282. The plaintiffs also allege that the lead plaintiffs purchased Qwest securities during the class period. *Complaint,* ¶ 32. Further, the plaintiffs allege that plaintiffs "who purchased shares of Qwest securities contemporaneously with the sales of Qwest securities by the Individual Defendants" have suffered damages. *Complaint,* ¶ 283. Finally, the plaintiffs have alleged that the individual defendants traded Qwest securities on a variety of specified dates during the class period, but those trades ended on May 31, 2002. *Complaint,* ¶ 255.

Although the plaintiffs' 20A claim is dependent on their securities fraud claim under § 10(b) or Rule 10b–5, I conclude that the specificity requirements for pleading fraud do not extend to the element of contemporaneous trading under § 20A. The fraud aspect of a § 20A claim resides in the requirement that a § 10(b) or Rule 10b–5 claim be pled adequately as a predicate to a § 20A claim. The contemporaneous trading requirement of § 20A is, at most, tangential to the underlying fraud aspect of the claim. Applying the standards of FED. R. CIV. P. 8 and 12(b)(6), the plaintiffs' § 20A claim is not subject to dismissal for failure to plead contemporaneous trades unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Plaintiff Sellers has pled a contemporaneous trade with defendant Nacchio. Even under the relatively lenient standards of Rules 8 and 12(b)(6), the allegations concerning the other plaintiffs' trades are quite thin because they are very general. Still, assuming the plaintiffs' very general allegations to be true, it is possible that the plaintiffs can prove facts which would show that some or all of the plaintiffs traded contemporaneously with some or all of the individual defendants. Thus, I conclude that the plaintiffs' allegations indicate that they have standing to pursue a § 20A claim against the individual defendants. Further, to the extent the plaintiffs have stated a fraud claim under § 10(b) or Rule 10b–5, I find that the plaintiffs also have stated a § 20A claim as to all of the individual defendants, except Jacobsen, Weisberg, and Wilks.

## V. § 11 CLAIM

The plaintiffs assert a claim under Section 11 of the 1933 Act, 15 U.S.C. § 77k, against Qwest, Andersen, Nacchio, Anschutz, Woodruff, Szeliga, Slater, and Tempest. Section 11(a) provides that when a securities registration statement contains material misstatements or omissions, persons who purchased securities sold in an offering covered by the registration statement may recover losses caused by the defect from the issuer, any person who signed the registration statement, directors of the issuer, and others. *See, e.g., Joseph v. Wiles,* 223 F.3d 1155, 1159 (10th Cir.2000). No scienter is required for liability under § 11. A defendant may be liable under § 11 for negligent material misstatements or omissions. *See, e.g., Ernst & Ernst v. Hochfelder* 425 U.S. 185, 208, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

Qwest argues that the plaintiffs have not stated a § 11 claim against Qwest. The individual defendants have adopted Qwest's arguments. First, Qwest argues that the plaintiffs have failed to plead falsity with the particularity required under FED. R. CIV. P. 9(b). In other words, Qwest argues that the plaintiffs must support their § 11 claim with allegations which satisfy the standard for pleading fraud under Rule 9(b). In paragraphs 284 and 290 of the Complaint, the plaintiffs clearly state that they are asserting their § 11 claim based on strict liability and negligence, not fraud. Qwest argues that the § 11 claim must be viewed as a fraud claim because the plaintiffs have incorporated all of the allegations of the Complaint into their § 11 allegations. Even considering this inclusion, I conclude that the plaintiffs properly may assert their § 11 claim as a strict liability and negligence claim. The plaintiffs' allegations are sufficient to state a § 11 claim based on strict liability and negligence.

Qwest also argues that the plaintiffs have not alleged that they purchased securities covered by Qwest's July 7, 2001, and October 30, 2001, registration statements. Both of these registration statements concerned debt offerings by Qwest. Absent an allegation that the plaintiffs purchased securities tied to these registration statements, the plaintiffs may not assert a § 11 claim based on material misstatements in those registration statements. In the Complaint, the plaintiffs allege that each of the plaintiffs and members of the proposed class "purchased, or otherwise acquired, the Qwest securities detailed in paragraphs 138–140, 218–220, and 231–232" of the Complaint. *Complaint,* ¶ 292. The allegations in these paragraphs include the July, 2001, and October, 2001, registration statements.

Qwest argues that the plaintiffs have said that they purchased Qwest *stock* during the class period, without mentioning Qwest debt securities. This statement was made in support of the plaintiffs' Motion to Appoint Lead Plaintiff, not in the Complaint. The plaintiffs' statement in their Motion to Appoint Lead Plaintiff raises a factual dispute which is not properly resolved on a motion to dismiss. Assuming the plaintiffs' allegations to be true, as I must under FED. R. CIV. P. 12, I conclude that the plaintiffs have stated a claim against Qwest and the individual defendants under § 11.

## VI. § 20(a) CLAIM & § 15 CLAIM

The plaintiffs assert a claim under § 20(a) of the 1934 Act, 15 U.S.C. § 78t, against Qwest, Nacchio, Woodruf, and Szeliga. The plaintiffs also assert a claim under § 15 of the 1933 Act, 15 U.S.C. § 77o, against Nacchio, Anschutz, Woodruff, and Szeliga. Under § 20(a) and § 15, "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the

primary violator." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir.1998). A § 20(a) claim must be predicated on liability under § 10(b) and Rule 10b–5. A § 15 claim must be predicated on liability under sections 11 or 12 of the Securities Act, 15 U.S.C. §§ 77k, 77l. 15 U.S.C. § 77o.

The plaintiffs assert that Qwest, Nacchio, Woodruf, and Szeliga are liable under § 20(a) based on the plaintiffs' claim under § 10(b) and Rule 10b–5. For the reasons discussed in Sections II and III of this order, I have found that the plaintiffs have stated a claim under § 10(b) and Rule 10b–5 on a variety of bases. However, I have also concluded that some aspects of the plaintiffs' § 10(b) and Rule 10b–5 claim have not been pled with sufficient particularity. The plaintiffs' § 20(a) claim must rise and fall with their § 10(b) and Rule 10b–5 claim. To the extent the plaintiffs' § 20(a) claim is based on the six inadequately pled accounting machinations described in Section II–A, above, the § 20(a) claim must be dismissed. On the other hand, the balance of the plaintiffs' § 20(a) claim has been pled adequately and is not subject to dismissal.

The plaintiffs allege that Nacchio, Anschutz, Woodruff, and Szeliga are liable under § 15 because they were controlling persons of Qwest. Nacchio. Anschutz, Woodruff, and Szeliga argue that the § 15 claim against them must be dismissed because the plaintiffs have failed to state a claim against them under § 11. As discussed above, I conclude that the plaintiffs have stated a § 11 claim against these defendants and others. As a result, the plaintiffs' also have stated a § 15 claim against these defendants.

## VII. CLAIMS AGAINST ARTHUR ANDERSEN, LLP

The plaintiffs name defendant Arthur Andersen, LLP as a defendant in their fraud claim under § 10(b) and Rule 10b–5, and in their § 11 claim for false and misleading statements in Qwest's registration statements. Andersen, a firm of certified public accountants, was employed by Qwest to provide independent auditing, accounting, tax, due diligence, and consulting services to Qwest during the class period. The plaintiffs allege that Andersen was employed to examine and opine on Qwest's financial statements for 1999, 2000, and 2001. *Complaint,* ¶ 259. According to the plaintiffs, Andersen "falsely represented that Qwest's financial statements for 1999 and 2000 were presented in accordance with GAAP, and Arthur Andersen's audit of Qwest's financial statements had been performed in accordance with Generally Accepted Auditing Standards ("GAAS")" *Complaint,* ¶ 260. Andersen argues that the plaintiffs have not alleged sufficient facts to support either claim asserted against Andersen.

As Andersen points out, the plaintiffs' response to Andersen's motion to dismiss frequently refers to factual claims which are not alleged in the Complaint. The plaintiffs may not effectively amend their Complaint by alleging new facts in their response to a motion to dismiss. In evaluating the sufficiency of the plaintiffs' allegations, I have evaluated only the allegations in the Complaint. I have disregarded the additional factual claims asserted by the plaintiffs in their response to Andersen's motion to dismiss.

### A. § 10(b) and Rule 10b–5 Claim

#### 1. Inadequately Pled Accounting Manipulations

As with all of the other defendants, I conclude that the plaintiffs' allegations concerning the six alleged accounting machinations described in Section II–A are too general to satisfy the pleading requirements of the PSLRA. To the extent the plaintiffs' § 10(b) and Rule 10b–5 claim

against Andersen is based on these alleged accounting practices, the plaintiffs' claim must be dismissed.

### 2. Statements by Arthur Andersen

Under the PSLRA, a plaintiff asserting a § 10(b) claim must specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading. 15 U.S.C. § 78u–4(b)(1). An accountant or auditor may be liable under § 10(b) only when the accountant or auditor itself makes a false or misleading statement or omission when it knows or should know that the statement will reach potential investors. *Anixter v. Home–Stake Production Co.*, 77 F.3d 1215, 1226–27 (10th Cir.1996).

In their Complaint, the plaintiffs cite only one specific statement made by Andersen. That statement is Andersen's January 24, 2001, report concerning Andersen's audit of Qwest's balance sheets "as of December 31, 2000 and 1999, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2000." *Complaint*, ¶ 263. In this statement, Andersen stated its opinion that the listed financial statements "present fairly, in all material respects, the financial position of Qwest. . . ." *Complaint*, ¶ 263. Andersen also said that its audit was performed in accordance with auditing standards generally accepted in the United States, and that its audit included an assessment of the accounting principles used by Qwest in preparing its financial statement.

Further, the plaintiffs allege that Andersen consented to the incorporation of "its false report on Qwest's financial statements" into Qwest's Form 10–K for 1999 and 2000. *Complaint*, ¶ 260. The plaintiffs do not indicate how a report dated January 24, 2001, was incorporated into Qwest's 10–K for 1999. Finally, the plain-

tiffs allege that Andersen "consented to the inclusion or incorporation of its report on Qwest's false financial statements in each of the registration statements and Prospectuses issued in connection with" each of three securities offerings by Qwest. *Complaint*, ¶ 291. The specified registration statements and prospectuses were issued on June 21, 1999, July 12, 2001, and October 30, 2001. *Complaint*, ¶ ¶ 138–40, 218–20, 231–32, 285. The plaintiffs do not indicate how a report dated January 24, 2001, was incorporated into the June 21, 1999, registration statement and prospectus.

The plaintiffs' allegations imply that Andersen made a separate statement concerning Qwest's 1999 financial statements, and possibly other statements concerning Qwest's financial statements. Nowhere, however, do the plaintiffs indicate when Andersen made any such statements, nor do they specify the content of such statements. The implication that Andersen made a statement concerning Qwest's 1999 financial statements is not sufficient to satisfy the PSLRA's requirement that the plaintiffs specify each statement on which their claim is based. I find that the plaintiffs have specified only Andersen's January 24, 2001, statement. Assuming this statement was materially misleading, Andersen also is subject to liability to the extent it consented to the inclusion of this statement in registration statements, prospectuses, and other statements by which such statements were communicated to investors. *Anixter*, 77 F.3d at 1226–27.

The plaintiffs claim that Andersen's statement was materially false and misleading because Andersen failed to comply with *generally accepted auditing standards* (GAAS) in preparing the report, and because Andersen did not obtain sufficient competent evidence to afford a reasonable basis for its expressed opinion that Qwest's

financial statements fairly represented Qwest's financial position. The plaintiffs also allege that Andersen knew its report would be relied upon by present and potential investors in Qwest.

In specifying the reason or reasons why this statement was misleading, the plaintiffs point to one specific flaw. That flaw is Andersen's alleged failure to report the nature of Qwest's IRU capacity swap transactions in the latter half of 2000. *Complaint,* ¶ 268–71. The plaintiffs allege that Qwest's recognition of revenue from these transactions violated GAAP, that Qwest failed to disclose the nature of these transactions, and that Qwest failed to disclose the effect these transactions had on Qwest's stated earnings. *Complaint,* ¶ 48. The plaintiffs allege that Andersen was aware of this improper accounting and Qwest's failure to disclose the nature of these transactions, but ignored these improprieties when issuing Andersen's January 24, 2001, statement.

The plaintiffs seem to imply that Andersen's statement was materially false because it failed to recognize any of the many other accounting machinations alleged by the plaintiffs. The plaintiffs make no allegations concerning Andersen's improper treatment of any of the other accounting machinations alleged in the Complaint. Nowhere do the plaintiffs point to any specific flaws in Andersen's audit procedures which led Andersen to either overlook or to knowingly misrepresent any of the other alleged misrepresentations contained in Qwest's financial statements. Absent specific allegations concerning Andersen's actions concerning these other accounting issues, the plaintiffs have not satisfied the specific pleading requirements of the PSLRA

In short, applying the requirements of the PSLRA, I conclude that the only statement made by Andersen which the plaintiffs have specified in their Complaint is Andersen's January 24, 2001, report concerning its audit of Qwest's financial statement. To the extent Anderson consented to the incorporation of this statement into other documents, Andersen may be subject to liability under § 10(b) and Rule 10b–5. Further, I conclude that the plaintiffs have specified only one reason why Andersen's statement was misleading. That reason is the plaintiffs' claim that Qwest's improper accounting for the IRU transactions caused Qwest's financial statements, and Andersen's audit of those statements, to be materially misleading. Again, the plaintiffs make no allegations concerning Andersen's improper treatment of any of the other accounting machinations alleged in the Complaint.

*3. Strong Inference of Scienter*

**■ A. Andersen's Knowledge of Material Facts**—Andersen argues that the plaintiffs' factual allegations do not support a strong inference of scienter as to Anderson because those allegations do not indicate that Andersen knew of the relevant material facts which indicated that Qwest's financial statements were materially inaccurate. Again, the plaintiffs allege that Andersen was employed to examine and opine on Qwest's financial statements for 1999, 2000, and 2001, and also was employed to provide consulting, tax, and due diligence services throughout this period. *Complaint,* ¶ 259.

As discussed above, the plaintiffs' § 10b and Rule 10b–5 claim against Andersen is limited to the alleged improper recognition of revenue on IRU transactions prior to Andersen's January 24, 2001, statement. In the Complaint, the plaintiffs allege that Qwest improperly recognized large amounts of IRU revenue in the third and fourth quarters of 2000. The plaintiffs allege that Qwest improperly recognized at least 230 million dollars in revenue from

IRU sales in the third quarter of 2000. *Complaint,* ¶ 49. This was 10 percent of commercial services revenue for that quarter: In the fourth quarter of 2000, Qwest allegedly recognized "hundreds of millions of dollars" in additional IRU revenue. *Complaint,* ¶ 53. This revenue allegedly included a 250 million dollar contract with Cable & Wireless.

According to the plaintiffs, Andersen was "intimately familiar with Qwest's business, including its IRU capacity and KMC equipment transactions," based on the "far-reaching scope of services provided by Arthur Andersen" to Qwest. *Complaint,* ¶ 259. Further, the plaintiffs allege that Andersen was aware of these issues because Andersen had wide experience in accounting for other telecommunications companies. *Complaint,* ¶ 268. The plaintiffs claim that Andersen knew that the Qwest's recognition of revenue on the IRU transactions was improper under applicable accounting principles, and that those principles required Qwest to disclose the true substance of the IRU transactions. *Complaint,* ¶ 271. Despite Andersen's knowledge of the improper recognition of large amounts of revenue on the IRU transactions, and Qwest's failure to disclose the substance of these transactions, the plaintiffs allege, Andersen certified that Qwest's financial statements were accurate.

Again, an allegation that a securities fraud defendant must have known of certain information because of the defendant's position in the company, without more, is not sufficient to support a strong inference of scienter under the PSLRA. *Fleming,* 264 F.3d at 1263—64 (allegations that defendants held senior management positions, had access to inside information, and thus must have known of fraudulent statements insufficient to plead scienter under PSLRA). However, an allegation that an individual defendant knew certain information based on that individual's position in a company, combined with other relevant allegations concerning knowledge or motive, can be sufficient to support a strong inference of scienter under the PSLRA. *Adams v. Kinder–Morgan, Inc.,* 340 F.3d 1083, 1105—06 (10th Cir.2003); *In re Sprint Corporation Securities Litigation,* 232 F.Supp.2d 1193, 1224 (D.Kan.2002).

Here, considering the totality of the plaintiffs' allegations against Andersen, I conclude that the plaintiffs allegations concerning Andersen's knowledge of the accounting issues presented by Qwest's IRU transactions are sufficient under the PSLRA. Andersen's key role in its work for Qwest was to ensure that Qwest's accounting was proper. The IRU transactions described in the Complaint involved the recognition of hundreds of millions of dollars of revenue during the latter half of 2000. The facts alleged in the Complaint indicate that the recognition of this revenue had a material effect on Qwest's financial statements. Further, the plaintiffs' allegations indicate that the source of this revenue, IRU transactions, presented accounting issues which were readily recognizable by an auditor. In short, considering the role played by Andersen, the magnitude of the IRU transactions, and the nature accounting issues presented, the allegations in the Complaint support a reasonable inference that Andersen was aware of these transactions and the accounting issues they presented. In essence, the plaintiffs allege that Andersen was aware of facts concerning the IRU transactions which should have put Andersen on notice that Qwest was engaging in a large scale recognition of revenue which was improper under GAAP, and which would likely result in a material misstatement of Qwest's financial position.

**B. Scope and Magnitude of Misrepresentations**—As discussed in Section

III–B–2, above, allegations of large-scale or long-standing accounting manipulations, and resulting misstatements, may support a strong inference of scienter under the PSLRA. The accounting machinations related to the IRU transactions, as described by the plaintiffs, involve manipulations and misrepresentations amounting to many hundreds of millions of dollars during the second half of 2000. As described by the plaintiffs, the IRU transactions had no economic substance. Rather, they were simply swaps which permitted Qwest to artificially inflate its revenue figures. As alleged, these manipulations and misrepresentations materially affected Qwest's public financial reporting for the third and fourth quarters of 2000, and two registration statements in 2001. The plaintiffs claim Andersen essentially certified Qwest's accounting for these transactions as accurate, even though Andersen knew it was not accurate. Even for a company of Qwest's size, these are misrepresentations of a substantial magnitude. The scope and magnitude of the IRU accounting manipulations and misrepresentations, as alleged by the plaintiffs, support a strong inference of scienter.

**C. Andersen's Motive**—As with the individual defendants, the plaintiffs argue that their claim against Andersen is supported by their allegations concerning Andersen's motive to commit fraud. As discussed in Section III–B–3, above, prior to the PSLRA, some circuit courts of appeals held that scienter could be alleged in a securities fraud case by showing the defendant's motive and opportunity to commit securities fraud. *Fleming*, 264 F.3d at 1261. To establish scienter by pleading motive and opportunity, the plaintiff had to allege that the defendant benefited from the alleged fraud in some concrete and personal way, "as when the defendants made material misrepresentations to maintain a high stock price and then sold their own shares at a profit."

*Id.,citing Novak v. Kasaks,* 216 F.3d 300, 307—08 (2nd Cir.2000). Under the PSLRA motive and opportunity pleading, standing alone, is not sufficient to allege scienter. *Fleming,* 264 F.3d at 1263. However, allegations concerning a defendant's motive and opportunity to commit securities fraud may be considered in determining whether the "plaintiffs' allegations, taken as a whole, give rise to a strong inference of scienter." *Id.*

The plaintiffs allege that Andersen was motivated to adopt Qwest's fraud in an effort to keep Qwest's audit business and, more importantly, Qwest's non-audit related work. The plaintiffs allege that in 2000 Andersen received 1.1 million dollars in audit fees from Qwest, and 6.8 million dollars in fees for non-audit related work. *Complaint,* ¶ 259. Andersen argues that an alleged motivation to earn fees for professional work from Qwest is not a sufficient motivation to support a strong inference of scienter.

Courts have reached differing opinions on the question of whether an auditor's desire to retain the business of a particular client can properly be seen as a motive to commit securities fraud. *See, e.g. Frymire–Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 191 (7th Cir.1993) (auditor's alleged effort to boost client corporation in the hope of enlarging stream of revenues for auditor in future years can be considered as indication of scienter; pre-PSLRA); *In re SmarTalk Teleservices Securities, Inc. Litigation,* 124 F.Supp.2d 505, 518 (S.D.Ohio 2000) (desire to maintain fees flowing from client relationship not sufficient basis on to infer scienter of auditor). Avarice often is the motive for fraud. Andersen argues that its desire to be paid a fair fee for its work should not be presumed to be fraudulent. I conclude that an auditor's desire to maintain a strong revenue stream from a client con-

ceivably could motivate a fraud by the auditor. However, as with stock sales, the vitality of the inference to be drawn for such a claimed motivation " 'depends on the facts, and can range from marginal to strong.' " *In re Cabletron Systems, Inc.*, 311 F.3d 11, 40 (1st Cir.2002) (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197–98 (1st Cir.1999)).

Here, the plaintiffs allege that the income of the partners in Andersen's Denver office were dependent on continued business from Qwest. Again, the plaintiffs allege that Andersen received nearly eight million dollars in fees from Qwest in 2000, with all but 1.1 million dollars attributable to non-audit work. A desire to retain the business of a client who paid fees at this level could motivate an auditor to disregard a client's accounting machinations. In this case, absent additional facts, I conclude that the plaintiffs' allegations concerning Andersen's motive to participate in Qwest's fraud is relatively weak, but not inconsequential.

### 4. Conclusion

The plaintiffs' § 10(b) and Rule 10b–5 claim against Andersen is limited to Andersen's January 24, 2001, report concerning its audit of Qwest's financial statement. The claim is further limited to Andersen's alleged misrepresentation concerning Qwest's improper accounting for the IRU transactions. The plaintiffs have not sufficiently specified other statements by Andersen, or other reasons why the January 24, 2001, statement was materially inaccurate. Although thin, I conclude that the plaintiffs allegations are sufficient to support a strong inference of scienter as to Andersen concerning this alleged statement and misrepresentation. The facts alleged are sufficient to demonstrate that Andersen had knowledge of the issues surrounding Qwest's accounting for IRU transactions. Further, the alleged accounting improprieties are of sufficient

magnitude to provide substantial support for an inference of scienter. Finally, Andersen's alleged motive to retain Qwest's 7.9 million dollars in yearly fees provides some additional support to a strong inference of scienter. Considering the totality of allegations against Andersen, I find that the plaintiffs' allegations support a strong inference of scienter under the PSLRA.

### B. § 11 Claim

The plaintiffs name Andersen as a defendant in their claim under § 11 of the 1933 Act, 15 U.S.C. § 77k. This is the same claim discussed in Section V, above. Under § 11, accountants may be liable for material misstatements in a registration statement if the accountant is, with the accountant's consent, named as having prepared or certified any part of the registration statement or any report or valuation used in connection with the registration statement. 15 U.S.C. § 77k (a)(4). Again, no scienter is required for liability under § 11. Rather, a defendant may be liable under § 11 for negligent material misstatements or omissions. *See, e.g.,* *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

Andersen argues that the plaintiffs have not stated a § 11 claim based on the June 21, 1999, registration statement because the plaintiffs have not specified what statement of Andersen's purportedly was included in that registration statement. I agree. Again, the only statement by Andersen clearly specified by the plaintiff is Andersen's January 24, 2001, statement. Obviously, that statement could not have been included in the June 21, 1999, registration statement.

Andersen also argues, as do the other defendants, that the plaintiffs do not have standing to sue based on the July 12, 2001, and October 30, 2001, registration statements. Andersen further argues, as do the other defendants, that the plaintiffs

have not met the pleading standard for fraud based claims in their § 11 claim against Andersen. For the reasons discussed in Section V, above, I reject these arguments.

Finally, Andersen argues that the plaintiffs have not sufficiently alleged which Andersen opinions which could have been included in the two 2001 registration statements were false or misleading. I conclude that the plaintiffs have adequately specified Andersen's January 24, 2001, statement, and the basis for the plaintiffs' claim that this statement contained a material inaccuracy concerning accounting for the IRU transactions. Further, the plaintiffs have alleged that Andersen consented to the incorporation of this statement into the two 2001 registration statements. These allegations are sufficient to state a § 11 claim based on this statement by Andersen.

To the extent the plaintiffs' § 11 claim against Andersen is based on other purported inaccuracies in Andersen's January 24, 2001, statement, the plaintiffs have not stated a § 11 claim against Andersen. I find that the plaintiffs have not sufficiently alleged which Andersen opinions were inaccurate, or the basis for the claimed inaccuracy.

## VIII. *LEAVE TO AMEND*

The plaintiffs seek leave to amend their Complaint should the court find that their allegations are not sufficient to support any of their claims. Generally, leave to amend should be "freely given when justice so requires." FED. R. CIV. P. 15(a). The plaintiffs' current Complaint is their fourth amended complaint. Because it does not clearly appear that an attempt to amend necessarily would be futile, the court will permit the plaintiffs one opportunity to amend their complaint to remedy the defects addressed in this order. Of course, the plaintiffs are not required to amend their Complaint. The plaintiffs are advised, however, that failure to satisfy the PSLRA's requirements on any repleading may result in dismissal of their claims with prejudice.

## IX. *CONCLUSION*

**THEREFORE IT IS ORDERED** as follows:

1) That defendant Qwest Communications International Inc.'s Motion to Dismiss the Fourth Consolidated Amended Complaint [# 153], filed October 31, 2002, is **GRANTED** as to the plaintiffs' claim under § 10(b) and Rule 10b–5 based on alleged improper accounting related to: a) the Warwick Valley Telephone Company transaction; b) Qwest's reporting of pro forma results in April, 2001; c) Qwest's claimed number of wireless customers; d) costs incurred in the VDSL project; e) revenue recognized from cramming and slamming practices; and f) payment of severance benefits;

2) That defendant Qwest Communications International Inc.'s Motion to Dismiss the Fourth Consolidated Amended Complaint [# 153], filed October 31, 2002, otherwise is **DENIED**;

3) That the Individual Defendants' Motion to Dismiss the Fourth Consolidated Amended Complaint [# 116], filed September 20, 2002, is **GRANTED** as to the plaintiffs' § 10(b) claim based on the six alleged improper accounting practices listed in paragraph 1), above;

4) That the Individual Defendants' Motion to Dismiss [# 116], is **DENIED** as to the plaintiffs' § 10(b) claim against defendant Smith, to the extent that claim is based on: a) the alleged misrepresentations concerning directory revenues; and b) the claims based on the improper inflation of revenue based on overstatement of customer orders for internet services (the

so called "flash" sales), as described in the Complaint at ¶¶ 80—81;

5) That the Individual Defendants' Motion to Dismiss [# 116], is **GRANTED** as to the balance of the § 10(b) claim against defendant Smith;

6) That the Individual Defendants' Motion to Dismiss [# 116], is **GRANTED** as to the plaintiffs' § 10(b) claim against defendants Jacobsen, Weisberg, and Wilks;

7) That the Individual Defendants' Motion to Dismiss [# 116], otherwise is DENIED as to the § 10(b) and Rule 10b–5 claims against the individual defendants;

8) That the individual defendants' motion to dismiss [# 116] is **GRANTED** as to the plaintiffs' § 20A claim to the extent that claim is based on alleged improper accounting related to: a) the Warwick Valley Telephone Company transaction; b) Qwest's reporting of pro forma results in April, 2001; c) Qwest's claimed number of wireless customers; d) costs incurred in the VDSL project; e) revenue recognized from cramming and slamming practices; and f) payment of severance benefits;

9) That the individual defendants' motion to dismiss [# 116] is **GRANTED** as to the § 20A claim against defendants Jacobsen, Weisberg, and Wilks;

10) That the individual defendants' motion to dismiss [# 116] is **DENIED** as to the remainder of the plaintiffs' § 20A claim;

11) That Qwest's motion to dismiss [# 153] is **DENIED** as to the plaintiffs' § 11 claim;

12) That the individual defendants' motion to dismiss [# 116] is **DENIED** as to the plaintiffs' § 11 claim;

13) That Qwest's motion to dismiss [# 153] is **GRANTED** as to the plaintiffs' § 20(a) claim to the extent that claim is based on alleged improper accounting related to: a) the Warwick Valley Telephone Company transaction; b) Qwest's report-

ing of pro forma results in April, 2001; c) Qwest's claimed number of wireless customers; d) costs incurred in the VDSL project; e) revenue recognized from cramming and slamming practices; and f) payment of severance benefits;

14) That Qwest's motion to dismiss [# 153] is **DENIED** as to the remainder of the plaintiffs' § 20(a) claim;

15) That the individual defendants' motion to dismiss [# 116] is **GRANTED** as to the plaintiffs' § 20(a) claim to the extent that claim is based on alleged improper accounting related to: a) the Warwick Valley Telephone Company transaction; b) Qwest's reporting of pro forma results in April, 2001; c) Qwest's claimed number of wireless customers; d) costs incurred in the VDSL project; e) revenue recognized from cramming and slamming practices; and f) payment of severance benefits;

16) That the individual defendants' motion to dismiss [# 153] is **DENIED** as to the remainder of the plaintiffs' § 20(a) claim;

17) That the individual defendants' motion to dismiss [# 153] is **DENIED** as the plaintiffs' § 15 claim;

18) That defendant Arthur Andersen LLP's Motion to Dismiss Fourth Consolidated Amended Class Action Complaint [# 114], filed September 20, 2002, is **DENIED** as to the plaintiffs' claim under § 10(b) and Rule 10b–5 to the extent this claim is based on Andersen's alleged misrepresentation concerning Qwest's improper accounting for the IRU transactions, as stated in Andersen's January 24, 2001, report concerning its audit of Qwest's financial statements;

19) That Andersen's motion to dismiss [# 114] is **GRANTED** as to the remainder of the plaintiffs' claim against Andersen under § 10(b) and Rule 10b–5;

20) That Andersen's motion to dismiss [# 114] is **DENIED** as to the plaintiffs' § 11 claim against Andersen to the extent that claim is based on Andersen's alleged misrepresentation concerning Qwest's improper accounting for the IRU transactions, as stated in Andersen's January 24, 2001, report concerning its audit of Qwest's financial statements, and the two registration statements into which that report allegedly was incorporated;

21) That Andersen's motion to dismiss [# 114] is **GRANTED** as to the remainder of the plaintiffs' § 11 claim against Andersen;

22) That discovery and all other pretrial procedures which have been stayed by the pendency of the defendants' motions to dismiss shall now proceed with regard to the surviving claims; and

23) That the plaintiffs shall have until **February 6, 2004**, to file any proposed amended complaint seeking to remedy the pleading defects addressed in this order.